**W.H. AVITTS, et al., Plaintiffs,**

v.

**AMOCO PRODUCTION COMPANY, et al., Defendants.**

**Nos. G–90–317 Thru G–90–326, G–90–338, G–90–339, G–90–390 Thru G–90–392 and G–91–52.**

United States District Court,
S.D. Texas,
Galveston Division.

Jan. 4, 1994.

Michael M. Todaro, Houston, TX, for W.H. Avitts, Ophelia Avitts.

Alton C. Todd, Todd & Hagood, Alvin, TX, for O.F. Westinghouse, Lillie Westinghouse.

A. Andrew Gallo, Amoco Production Co., Alton J. Hall, Wickliff & Hall, Houston, TX, for Amoco Production Co., Kermitt W. Walrond.

William R. Hurt, Houston, TX, for Exxon Corp.

Roxanne Armstrong, Apache Corp., Alton J. Hall, Wickliff & Hall, Houston, TX, for M.W. Petroleum Corp., Apache Corp.

Andrew S. Hanen, Hanen, Alexander & Spalding, William R. Hurt, Peggy O. Donley, Houston, TX, William Rollins Hurt, Exxon Co. USA, New Orleans, LA, Peggy O'Neill Montgomery, Exxon Co. USA, Houston, TX, Ridgely C. Bennett, Asst. Atty. Gen., Austin, TX, for Exxon Co., U.S.A.

### ORDER AND FINAL JUDGMENT ON PLAINTIFFS' APPLICATION FOR INTERIM ATTORNEY'S FEES

KENT, District Judge.

This cause came to trial on November 8, 1993, on the Plaintiffs' claims for nuisance,

trespass, negligence, and breach of contract. Essentially, the Plaintiffs sought relief for the surface and subsurface contamination of their property brought on by the oil exploration operations of the Defendants. After four days of testimony, including that of James Trickett, head of the environmental section for Defendant Amoco Production Company, it became apparent that final and just relief in this matter could not be accurately decided until the Defendants determined the extent of the contamination suggested by their preliminary investigations. Therefore, the Court suspended all proceedings in this cause, save Plaintiff's interim application for attorney's fees, pending the completion of a Phase II environmental study by the Defendants. *See* Order of November 18, 1993. Before the Court is said application. For the reasons stated below, the Court GRANTS the application to the extent it requests $328,266.00 in attorney's fees, and $315,875.99 in expenses.

## I. Background

The Plaintiffs in this case are surface and/or royalty interest owners in the West Hastings Oil Field, in between Alvin and Friendswood, Texas. This field was first discovered in 1934, and at one point produced 70,000 barrels per day. Today the field has 110 producing wells, all requiring some type of artificial lift.

Production from the West Hastings Field is characterized by a rather high ratio of salt water. Historically, the field operators disposed of this salt water in open collection pits that provided for natural evaporation. The use of such pits ultimately became severely restricted by law. Salt water has also been disposed of by re-injection into abandoned wells.

Defendants are past and current operators of the West Hastings Field. Plaintiffs contend that Defendants' operations have contaminated both the area's subsurface freshwater supply and the surface of their properties, in derogation of their common-law rights and of state and federal regulations. In particular, Plaintiffs allege that Defendants have negligently allowed salt water to pollute the subsurface, that they are using

lift systems which allow subsurface pollution, that they have failed to plug abandoned well to prevent seepage, and that on occasion they allow oil and waste products to spill on the surface.

## II. The American Rule

■ It is, of course, axiomatic to both Federal and Texas jurisprudence that—with narrow exceptions—a litigant cannot recover the cost of his attorney's fees from his adversary absent specific statutory or contractual authorization. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Dallas Cent. Appr'l Dist. v. Seven Inv. Co.*, 835 S.W.2d 75 (Tex.1992). Accordingly, to establish their claim for reimbursement the Plaintiffs must demonstrate either that their application falls within one of the common-law exceptions to this "American Rule," or that a fee-shifting statute applies to their claims.

■ The Supreme Court has strictly limited the common-law exceptions to the American Rule in civil actions to three narrow circumstances, each purportedly arising from the federal courts' "historic power of equity." *Alyeska*, 421 U.S. at 257, 95 S.Ct. at 1621. Two of the common-law exceptions are clearly inapplicable to the case at bar: where a party has willfully violated a court order, *see Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426–28, 43 S.Ct. 458, 465–66, 67 L.Ed. 719 (1923), and where a party has acted in bad faith or has engaged in oppressive litigation practices. *See Alyeska*, 421 U.S. at 258–59, 95 S.Ct. at 1622–23. The third exception arises where successful parties have, through their efforts at litigating their individual claims, created a common monetary fund or other substantial benefit which inures to a larger discrete class, over whom the court has jurisdiction. *See Hall v. Cole*, 412 U.S. 1, 5–6, 93 S.Ct. 1943, 1946–47, 36 L.Ed.2d 702 (1973) (granting attorney's fees against a union in favor of member who had vindicated free speech rights of all members); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 391–92, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970) (granting fees against corporation in favor of plaintiff stockholders, where litigation had vindicated rights of all

stockholders). By spreading the cost of litigation over the class of beneficiaries, this exception prevents the unjust enrichment of the class at the expense of the plaintiff who took the initiative to pursue the classes' claim.

■ The common fund/substantial benefit exception almost describes the circumstances of this case. Even if the Plaintiffs in this case fail to establish the monetary liability of the Defendants for pollution in the West Hastings field, they will have succeeded in determining the extent of any contamination or potential contamination of the acreage overlying the field. Moreover, because the dynamics of fieldwide migration require that this determination be made through fieldwide testing, this information will benefit not only the named Plaintiffs, but also the larger (and arguably discrete) class consisting of the thousands who reside over West Hastings.

The posture of this case, however, does not present the Court with one indispensable requirement for applying the substantial benefit exception: jurisdiction over the beneficiary class. *See Johnson v. United States Dep't of Housing & Urban Dev.*, 939 F.2d 586, 590 (8th Cir.1991); *Sierra Club v. Lynn*, 502 F.2d 43, 64–65 (5th Cir.1974), *cert. denied*, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975). Without some means of imposing the costs on the class, as opposed to an independent third party, the equitable theory behind the exception is inapplicable. In other words, this exception does not allow fee *shifting* of litigation costs to a wrongdoer; it only allows fee *spreading* among the beneficiaries. This principle is easily applied where a common fund is created: the attorney's fees and expenses are simply paid out of the common fund prior to its distribution. When the benefit is non-monetary, however—as in this case—this principle effectively limits the application of the exception to those cases in which the beneficiaries and the defendant to be charged are associated in such a way that the expense will flow through to the class. This occurs when, for example, the characterization of the plain-

tiff/defendant/class relationships are union-member/union/union-membership, *see Hall, supra,* or shareholder/corporation/shareholders, *see Mills, supra.*

Prior to the *Alyeska* decision, many courts held that their inherent equitable powers called for a fourth exception to the American Rule, for cases where private citizens prosecuted lawsuits in which the outcome would vindicate substantial public rights with little prospect of direct monetary benefit to the plaintiff. These cases did not qualify for the "substantial benefit" exception because the rights vindicated were those of the public at large, rather than of a discrete group, and the private defendants were not in a position to distribute their losses to the public.[1] Nonetheless, the courts reasoned that equity required reimbursement to these parties, acting as "private attorneys general" on behalf of the citizenry, with the wrongdoer bearing the expense. *See Alyeska*, 421 U.S. at 282–288, 95 S.Ct. at 1634–37 (Marshall, J., dissenting).

The "private attorneys general" theory would allow the shifting of attorney's fees in this case; indeed, the theory largely found its genesis in environmental litigation. The plaintiffs here, at great expense, have sought the abatement of potentially large-scale environmental damage. The Plaintiffs' efforts have benefited a large segment of the public at large, none of whom will even indirectly share in the cost of this effort. Equity would certainly fail to balk at shifting this expense to the Defendants, who have reaped substantial profits over many decades from the activities causing the damages complained of here.

The *Alyeska* Court, however, squarely rejected this theory, strictly limiting the common-law American Rule exceptions to those which it had recognized prior to 1975. In *Alyeska*, the plaintiffs—a non-profit environmental association—had succeeded in blocking the construction of the Alaska Pipeline prior to Congressional intervention. The circuit court awarded the plaintiffs a portion of their attorneys' fees against the pipeline con-

---

1. These cases pre-dated the Equal Access to Justice Act, Pub.L. No. 96–481 (1980); hence, the theory of this exception did not apply to government defendants which enjoyed sovereign immunity to money damages.

sortium because their action had directly furthered the purposes of then-existing law under the National Environmental Policy Act (NEPA), as authorized by that act. Nonetheless, reasoning that the costs statute specifically denied plaintiffs the right to attorney's fees absent statutory authorization, and failing to distinguish how the other three exceptions had evolved in spite of that provision, the Supreme Court reversed. "[The American Rule] is deeply rooted in our history and in congressional policy; and it is not for us to invade the legislature's province by redistributing litigation costs in the manner suggested...." *Id.*, 421 U.S. at 271, 95 S.Ct. at 1628.

In response to this decision, Congress has included an attorney's fees provision in the private enforcement sections of nearly every major piece of environmental legislation it has passed since.[2] *See* Steven M. Dunne, *Attorney's Fees for Citizen Enforcement of Environmental Statutes*, 9 Stan.Envtl.L.J. 1, 1 (1990). Congress has not, however, amended the costs statute, nor has it otherwise provided a general right of fees recovery for "private attorneys general." Hence the principles of *Alyeska* have stood rigidly unassailed, and environmental litigators must be careful to bring their actions within the strictures of a specific statutory authorization if they intend to pursue the recovery of their fees and expenses.

### III. Clean Water Act

■ As one potential basis for fees shifting, the Plaintiffs urge that their action is governed by the federal Clean Water Act, 33 U.S.C. § 1251 et seq. Under this Act, private litigants may recover their attorney's fees and expenses in a civil action to enforce any effluent standard established under the Act's provisions. 33 U.S.C. § 1365(a).

The Plaintiffs' assertion that their claims fall within this Act may well be correct, in fact. In court, however, the Plaintiffs have not presented any evidence to support such a claim. In particular, the Plaintiffs have never indicated to the Court that effluent standards for the West Hastings Field have even been *established* under the Act, much less indicated what these standards are.

Moreover, this Court does not currently have jurisdiction over this case under the Clean Water Act. The Act's private enforcement provisions specifically require potential litigants to notify the potential defendant, *and* the Environmental Protection Agency, *and* the State, of their intentions to sue, at least 60 days prior to the commencement of any action under the Act. This provision is substantially identical to the private enforcement provisions of numerous federal environmental acts,[3] and its purpose and effect are well-established. Its purpose is to allow the potential defendant time in which to bring its activities into compliance, and to allow the EPA and State time in which to consider whether they will commence their own enforcement actions, thereby precluding an independent private proceeding. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 30, 110 S.Ct. 304, 311, 107 L.Ed.2d 237 (1989) (interpreting identical provision of the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. § 6972). Its effect is jurisdictional: notice is a strictly construed, mandatory condition precedent to the commencement of suit, and failure to at least substantially comply with the notice provision plainly deprives the court of any discretion to hear claims under the Act. *Id.* at 31, 110 S.Ct. at 311. Hence the Plaintiff's failure to plead, prove, or argue that it gave the requisite notices defeats this Court's ability to award *any* relief under this statute.

Plaintiffs argue that Defendants nonetheless had "sufficient" notice, "in substance if

---

**2.** Similarly, Congress quickly acted to legislatively overrule Supreme Court decisions which rejected the private attorneys general theory in civil rights cases, *see* Pub.L. No. 94–559, 90 Stat. 2641 (1976) (codified as amended at 42 U.S.C. § 1988), and which subsequently excluded the recovery of expert witness fees from *that* attorney's fees provision, *see* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1074.

**3.** *See, e.g.,* Toxic Substances Control Act, 15 U.S.C. § 2619; Safe Drinking Water Act, 42 U.S.C. § 300j–8; Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. § 6972.

not in form," for jurisdiction to attach. However, Plaintiffs do not specify what the contents of that notice were, so that the Court can determine whether or not it was in substantial compliance with the form specified in the EPA regulations. *See National Wildlife Fed. v. Consumers Power Co.*, 657 F.Supp. 989 (W.D.Mich.1987) (allowing suit to proceed on such substantial compliance), *rev'd on other grounds,* 862 F.2d 580 (6th Cir. 1988). More importantly, however, Plaintiffs have made *no* argument that the EPA or the State were given *any* kind of notice as required prior to the suit's commencement.

### IV.  Oil Spill Prevention and Response Act of 1991

■ The Texas Oil Spill Prevention and Response Act of 1991 (OSPRA) supports and implements the federal Oil Pollution Act of 1990, Pub.L. No. 101–380 (codified at 33 U.S.C. § 2701 et seq.) (OPA). *See* Tex.Nat. Res.Code Ann. § 40.002 (Vernon Supp.1993). Plaintiffs argue that this Act also provides an avenue through which they may recover attorney's fees.

OSPRA establishes a "Coastal Protection Fund" to provide immediately available funds for the cleanup and payment of damages resulting from unauthorized oil discharges. *Id.* at § 40.151. The Act allows persons who incur response costs, or who are entitled to damages as a result of unauthorized discharges, to receive compensation from this state-administered fund. *Id.* at §§ 40.157 to 40.162. In turn, the persons responsible for the discharge are liable to the fund for these costs. *Id.* at §§ 40.201 to 40.205.

Even under the most liberal construction, this scheme of compensation from the fund is the only type of claim which OSPRA authorizes for private parties. The Act does not create an independent cause of action for private parties directly against the covered polluters. Rather, the Act specifically states:

> The remedies in this chapter are cumulative and not exclusive. This chapter does not require pursuit of any claim against the fund as a condition precedent to any other remedy, nor does this chapter prohibit any person from bringing an action at common law or under any other law not inconsistent with this chapter for response costs or damages resulting from a discharge or other condition of pollution covered by this chapter.

*Id.* at § 40.256. Hence the Act preserves a complainant's other remedies, but does not itself create a private cause of action. Therefore, while the Act does not bar the Plaintiffs' action here, they must find their substantive remedies elsewhere.

### V.  Oil Pollution Act of 1990

■ **A. Applicability:** The Court does agree with the Plaintiffs, however, that the federal Oil Pollution Act affords them the substantive remedies sought here. The OPA provides a comprehensive regulatory and liability scheme governing all forms of petroleum pollution affecting the navigable waters of the United States, to the extent they are not covered by the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA). In general, the OPA dictates that "each responsible party for a . . . facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) that result from such incident." 33 U.S.C.A. § 2702(a) (West Supp.1993). The damages referred to include "[d]amages for injury to, or economic losses resulting from destruction of real or personal property, which shall be recoverable by a claimant who owns or leases that property." *Id.* at § 2702(b).

A "facility" under § 2702 includes "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil." *Id.* at § 2701(9). This definition is more than broad enough to encompass all of the Defendant's operations in the West Hastings Field. The "responsible party" for an onshore facility such as this one is "any person owning or operating the facility"; here, the Defendants.

The Defendants counter that the Plaintiffs have produced no evidence that they have discharged, or pose a substantial threat of discharging, oil into navigable waters. The Court disagrees. The evidence produced at trial indicated that the West Hastings Field surrounds Chigger and Cowart Creeks, which flow directly into Clear Lake, a navigable bay on the Gulf of Mexico. By its Order of November 18, this Court implicitly found that the West Hastings operations pose a substantial threat of discharging oil into these waterways, both through surface and subsurface leakage.[4] *See Id.* at § 2701(7) ("discharge" includes "any emission (other than natural seepage), intentional or unintentional, and includes . . . spilling [and] leaking. . . .").

The Defendants' further maintain that the Act is inapplicable because Chigger and Cowart Creeks are not themselves navigable waters. This argument, however, proposes an unduly narrow interpretation of the Act. The OPA is a remedial statute broadly designed to address the nationwide and pernicious threat to coastal waters posed by unnecessary pollution resulting from oil exploration activities. One need only stroll along the tar-covered beaches of Galveston Island to observe the extent and urgency of this threat. A construction of the statute which would limit its application strictly to pollutants discharged directly into navigable waters would unjustifiably thwart the Act's aim of remediating *all* causes of this contamination. Indeed, under the Defendants' interpretation, a polluter located directly on the ship channel could take itself out of the scope of the Act simply by removing its contaminating drain-pipe from its dock and placing it in the ditch running behind the plant, claiming that it is no longer directly discharging into navigable waters.

Such a narrow reading of the OPA would unnaturally distort the Act's clear language. While the Act specifically provides for the liability of shore-based facility owners to the owners of real property damaged by the

facilities' pollutants, nowhere does it indicate a requirement that either the facility or the property be located adjacent to, or even near to, navigable waters. Rather, the only minimum nexus an incident must have to the coastline is that the facility "poses the substantial threat of discharge of oil, into or upon the navigable waters or adjoining shorelines." *Id.* at § 2702(a). The West Hastings Field being located in the drainage basin of Clear Lake, it necessarily follows that any large-scale surface or near-surface discharges in the field pose a substantial threat to Clear Lake's water quality.

The Court recognizes that this analysis becomes more difficult to apply as the subject oil fields become further from shore. At some point the fields' arguable proximity to drainage systems which ultimately feed into navigable waters *only after great distance* will provide simply too remote a threat to bring the action within the strictures of the OPA. West Hastings, however, is not such a field.

**B. Recovery Allowed:** Unlike OSPRA, the OPA specifically creates a private right of action for direct recovery from the polluter by private claimants. The Act directs that all claimants shall, with certain permissive exceptions not applicable here, first present their claims for removal costs or damages to the responsible party. *Id.* at § 2713(a). If the person to whom the claim is presented denies liability for the claim, "the claimant may elect to commence an action in court against the responsible party. . . ." *Id.* at § 2713(c). This Court has jurisdiction over such claims for discharges in this judicial district, without regard to the citizenship of the parties or the amount in controversy. *Id.* at § 2717(b).

█ Nowhere, however, does the Act explicitly use the phrase "attorney's fees" in its description of private claimants' rights to recovery. Rather, the Act describes the polluters liability to the claimant in terms of

---

4. This finding also negates Defendants' argument that the OPA is inapplicable because it became effective the month *after* the Plaintiffs commenced this lawsuit. The injunctive relief ordered by the Court concerns the ongoing threat of environmental contamination, not past occurrences. The enactment date may, however, limit the recoverable removal costs according to the dates on which they were incurred.

damages and removal costs. *Id.* at § 2702. Generally, where a statute creates a cause of action only for "damages," the right to attorney's fees will not be implied. *See, e.g., F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 128, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974) (refusing to allow fee shifting under statute providing for recovery of "sums justly due"); *see also Fleischmann v. Maier Brewing Co.,* 386 U.S. 714, 720, 87 S.Ct. 1404, 1408, 18 L.Ed.2d 475 (1967) (provisions for recovery of "costs" are strictly limited to statutory costs, to the exclusion of attorney's fees). The success of the Plaintiffs' application for fees, then, depends on whether this item can properly be taxed as "removal costs" under the statute.

■ The OPA holds responsible parties liable for "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan." 33 U.S.C.A. § 2702(b)(1) (West Supp. 1993). At best, this provision is vague. The National Contingency Plan is the set of regulations governing the administration of the government's response to environmental hazards. *See* 40 C.F.R. Part 300 (1992). The response plan for oil discharges is governed by Subpart D, 40 C.F.R. § 300.300 et seq., which, in general, outlines a four-phase response framework. Phase I requires any person in charge of a facility to notify the appropriate federal officials immediately upon discovery of an unlawful discharge. *Id.* at § 300.300(b). Any other person discovering an oil discharge is required to notify the National Response Center "as appropriate." *Id.* at § 300.300(c). At Phase II, the federal coordinator is required to assess the magnitude of the threat and the feasibility of removal, identify the responsible parties, attempt to have the discharger commence voluntary removal actions, and otherwise "take appropriate response actions." *Id.* at § 300.-305. Phase III directs the coordinator to pursue containment, cleanup, and disposal measures, and Phase IV governs documenta-

tion and cost recovery. *Id.* at §§ 300.310–315.

The National Contingency Plan being an administrative scheme, it is not entirely clear what actions a private litigant should take to be "consistent" with the Plan. The Fifth Circuit has recently held, under a similar provision of CERCLA, that the EPA acts "not inconsistent" with the Plan—and hence is entitled to recoup hazardous waste removal costs—when it takes actions which are not arbitrary or capricious. *In re Bell Petroleum Serv., Inc.,* 3 F.3d 889, 907 (5th Cir.1993) (disallowing recovery for removal cost which was expended for no logical reason). While it is not clear that this same standard would apply for private litigants,[5] this Court finds that, under any standard, the actions taken by the Plaintiffs in this case have been consistent with the National Contingency Plan. Having identified the threat of oil being discharged from the Defendants' facilities into navigable waters, the Plaintiffs encouraged the Defendants to commence further study and remediation efforts, in accordance with Phase I of the Plan. The Defendants having refused, and the Plaintiffs lacking the resources to pursue remediation efforts at their own expense, the Plaintiffs sought relief in this Court. Under the circumstances, and considering that such an action is contemplated by the OPA, the Court finds this to be an "appropriate response action" pursuant to Phase II. Furthermore, the relief obtained by the Plaintiffs thus far is exactly that contemplated by the Plan: a preliminary injunction ordering the Defendants to conduct a Phase II study of the extent of the environmental threat which their operations pose and the feasibility of remedial actions. *See General Electric Co. v. Litton Indus. Automation Sys., Inc.,* 920 F.2d 1415, 1419–20 (8th Cir.1990) (finding the actions of a private CERCLA litigant to be consistent with the Plan: "The site evaluation does not have to comply strictly with the letter of the NCP, but only must be consistent with its require-

---

5. The *Bell Petroleum* court followed the Tenth Circuit's decision in *United States v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992), *cert. denied,* — U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). The *Hardage* court, in turn, reasoned that the arbitrary and capricious standard should apply

to EPA actions under CERCLA because "the choice of a particular clean-up method is a matter within the discretion of the EPA." *Id.* (citations omitted). It is not clear that this same deference would be afforded private parties.

ments."), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991).

Therefore, the Plaintiffs have incurred expenses for acts which are "consistent with" the National Contingency Plan, and under 33 U.S.C. § 2702(b)(1)(B) they are entitled to recover from the Defendants such expenses which qualify as "removal costs." In cases concerning the substantial threat of a discharge of oil, qualifying expenditures include "the costs to prevent, minimize, or mitigate oil pollution." *Id.* at § 2701(31). It is true that this list does not include the phrase "including attorney's fees." And as discussed above, the American Rule does not allow courts to lightly infer the statutory allowance of attorney's fees. To find statutory authorization, the Court must find more than "generalized commands," *Runyon v. McCrary,* 427 U.S. 160, 186, 96 S.Ct. 2586, 2602, 49 L.Ed.2d 415 (1976); there must be a clear expression of Congressional intent.

On the facts of this case, this Court finds that the comprehensive statutory structure of the OPA demands that the expenses the Plaintiffs have incurred in enforcing the Act's provisions necessarily include their reasonable litigation expenses, including attorney's fees. First of all, the Court notes that the posture of this case does not present the classic "fee-shifting" situation contemplated by the American Rule, in which attorney's fees are simply part of the spoils of the victor. Rather, the litigation expenses incurred thus far by the Plaintiffs represent the most practical and efficient means by which individual citizens such as these could have exercised their right of private enforcement of the OPA. While the language of the OPA generally contemplates actions by parties who have already cleaned up a spill site and then seek reimbursement from the responsible party, such a course of action would be clearly beyond the resources of individual landowners seeking to clean literally hundreds of sites located across thousands of acres. Litigation in this case was the only viable means available to remove the contaminants, and the threat of contamination, from their land. To disallow the legitimate litigation expenses Plaintiffs thus incurred here solely to "prevent, minimize, or mitigate oil pollution," simply on the basis that the phrase "attorney's fees" is not enumerated in the statute, would be absurd.

Moreover, this Court would find that the removal costs allowed under the OPA would include attorney's fees even in the typical post-cleanup reimbursement action. In interpreting a similar cost recovery provision under CERCLA, which also allows private parties an action for the recovery of response costs but does not explicitly allow attorney's fees, the Eighth Circuit has reasoned:

> Attorney fees and expenses necessarily are incurred in this kind of enforcement activity and it would strain the statutory language to the breaking point to read them out of the "necessary costs" that section 9607(a)(4)(B) allows private parties to recover. We therefore conclude that CERCLA authorizes, with a sufficient degree of explicitness, the recovery by private parties of attorney fees and expenses. This conclusion based on the statutory language is consistent with two of the main purposes of CERCLA—prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party. These purposes would be undermined if a non-polluter (such as [the plaintiff] ) were forced to absorb the litigation costs of recovering its response costs from the polluter. The litigation costs could easily approach or even exceed the response costs, thereby serving as a disincentive to clean the site.

*General Electric,* 920 F.2d at 1422.

*General Electric* has led to a split in Circuit authority on this issue under CERCLA, with the Sixth Circuit following its reasoning while the First, Ninth, and Tenth Circuits have declined to do so. *Donahey v. Bogle,* 987 F.2d 1250, 1256 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993); *In re Hemingway Transport, Inc.,* 993 F.2d 915, 935 (1st Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993); *Stanton Road Assoc. v. Lohrey Enter.,* 984 F.2d 1015, 1019 (9th Cir.1993); *FMC Corp. v. Aero Indus., Inc.,* 998 F.2d 842, 847 (10th Cir.1993). The Fifth Circuit has not addressed the issue. The conclusion reached by the *FMC* court

particularly highlights the difficulty of reconciling the American Rule with the purposes of environmental law: the court reasoned that, while the rule of *Alyeska Pipeline* prohibits including *litigation* attorney's fees within the scope of "response costs," such costs *do* properly include *non-litigation* attorney's fees incurred in responding to an environmental hazard. *Id.* While this Court finds such an attempt to harmonize the conflicting policies at issue to be admirable, the result is a contortion of reason. Therefore, this Court is persuaded that the analysis of *General Electric* is unassailable by logic (even if questionable by relentless tradition), and adopts it accordingly.

■ Finally, contrary to Defendants' assertions, it is not a prerequisite to recovery of qualifying costs that Plaintiffs' claims reach final adjudication, or even that they be judged the prevailing parties. Rather, "an action may be commenced under this subchapter for recovery of removal costs at any time after such costs have been incurred." 33 U.S.C.A. § 2717(f)(2) (West Supp.1993). Therefore, it is not dispositive that the Plaintiff's have yet to achieve all of the relief pled for. To date, they have achieved a substantial portion of the relief they sought: further study of the effects on the environment of oil exploration in the West Hastings Field, and of the remediation required. Furthermore, evidence at trial suggested that the Defendants had plugged dozens of abandoned wells—another primary goal of the Plaintiffs—since the commencement of this lawsuit. Where a defendant voluntarily complies with the demands of the plaintiff in an environmental lawsuit, of course, it is fair to infer that the litigation provided the catalyst for this action, making an award of attorney's fees appropriate. *See Atlantic States Legal Found. v. Eastman Kodak,* 933 F.2d 124 (2nd Cir.1991). Here, the Plaintiffs have, at substantial expense, achieved the implementation of the next cleanup phase called for by the National Contingency Plan under the OPA—an action which may well encourage the Defendants to further fund any remediation thereby found necessary. This is exactly the course of events encouraged by the OPA. Under the terms of the statute, the Plaintiffs are entitled to recoup from the Defendants their expenses incurred in reaching this result.

## VI. Reasonableness of Fees and Costs

■ **A. Attorney's Fees:** Given the extensive experience of Plaintiffs' lead counsel, Alton C. Todd, as well as his exceptional abilities, and the complexity of this litigation, the Court finds that a reasonable fee for Mr. Todd's services is $300 per hour. Likewise, the Court finds that the suggested hourly rates of Mr. Todd's associates and assistants are reasonable. Because of the number of plaintiffs represented by Mr. Todd, the numerosity of and geographical area covered by the oil wells at issue, the complexity of the legal questions at issue, and the extent and difficulty of discovery in this case, the Court also finds that the time devoted to this case by Plaintiffs' counsel was reasonable. Finally, the Court finds that the nature of these efforts render the time incapable of severance as between either the individual Plaintiffs or Defendants.

■ However, the Court notes that it is awarding these fees as "removal costs" under the Oil Pollution Act of 1990 (OPA), which did not take effect until August 18, 1990. In particular, the portion of the Act giving rise to a private cause of action states: "Nothing in this title shall apply to any cause of action or right of recovery arising from any incident which occurred prior to August 18, 1990." 33 U.S.C. § 2717(e). The applicability of this provision to the case at bar, which concerns intermittent and ongoing pollution taking place both before and after the OPA's enactment, is unclear. Furthermore, the Court has found no relevant authority to guide its interpretation of this provision. However, the Court finds that the language of the statute evinces a disclaimer of retroactivity sufficient to preclude the award of removal costs incurred prior to its enactment date. *Cf. Bradley v. Richmond School Bd.,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (allowing the retroactive application of a fee-shifting statute absent clear congressional intent to the contrary, but limiting the award to after the date plaintiffs first re-

quested attorney's fees). Therefore, the Court has redacted from the Plaintiffs' application that time spent prior to August 18, 1990, or 10.5 hours for Mr. Todd and 6.25 hours for Ms. Sellenriek.

Accordingly, the Court awards attorney's fees as follows:

| | | |
|---|---|---|
| Alton Todd: | 758.25 hrs @ $300/hr | $227,475.00 |
| Steve Crenshaw: | 255.00 hrs @ $150/hr | 38,250.00 |
| Andrew Siebert: (law clerk) | 187.00 hrs @ $ 75/hr | 14,025.00 |
| Cathy Sellenriek: (legal assistant) | 808.60 hrs @ $ 60/hr | 48,516.00 |
| Total: | | $328,266.00 |

---

**B.  Expenses:** The Court finds that the following expenses were reasonable and necessary to achieve the results obtained by Plaintiffs thus far:

| | |
|---|---|
| Expert Witnesses: | $203,949.41 |
| Graphics: | 16,796.93 |
| Witness Fees (4): | 120.00 |
| Court Costs/Subpoenas: | 538.00 |
| Courier and Freight Services: | 2,356.30 |
| Depositions: | 34,890.60 |
| Investigators: | 6,195.00 |
| Records: | 405.90 |
| Documents: | 30,828.94 |
| Miscellaneous: | 10,752.68 |
| Total: | $315,875.99 |

Under the heading "miscellaneous," the Court has disallowed expenses for general legal texts and for bar admission fees: clearly, these are simply overhead costs. The Court also has disallowed a $3,000 expense to Synectics listed under this category; Plaintiffs included no supporting receipt or other explanation of this charge, and it appears to be the same amount as a deposit to that company which is included in the amount billed as "graphics." If this is true, granting this charge would lead to a double recovery of this amount. The Court also will not grant Plaintiffs reimbursement for the expenses listed in their application under "Long Distance Telephone" or "Travel," as Plaintiffs offered no explanation of any these charges by which the Court could determine their reasonableness. As none of the expenses pre-date the enactment of the OPA, however, none will be excluded on this basis.

Defendants argue that expert witness fees are not recoverable because the Supreme Court has rejected the characterization of this expense as an integral part either of statutory "attorney's fees" or "costs." *See West Virginia Univ. Hosp. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). However, the Court has not awarded attorney's fees *eo nomine* under an attorney's fees statute. Rather, the Court's award is based on the characterization of these expenses as appropriate removal costs subject to recovery under the OPA, and this same analysis applies directly to *all* other expenses reasonably incurred to procure the cleanup of the West Hastings Field, including the fees of experts and the cost of demonstrative evidence which proved helpful to this Court. Therefore, *Casey* is not dispositive in this case.

Defendants also object to the inclusion of certain expert witness fees which Plaintiffs had allegedly "agreed to absorb." Defendants base this argument on a letter in which Mr. Todd agreed to "be responsible for" the expenses of Defendants' experts when he deposed them. The Court is of the opinion, however, that the only reasonable interpretation of this letter is that Mr. Todd agreed to

pay Defendants' experts "up front," and not that Mr. Todd agreed to never seek reimbursement if he should prove to be legally entitled to do so.

\*    \*    \*    \*    \*    \*

Accordingly, the Court **GRANTS** the Plaintiffs' application for attorney's fees and expenses, as specified above. Having found the award of litigation expenses to be appropriate under the OPA, the Court need not reach the issue of the propriety of a fee award under Plaintiffs' breach of contract claims. The Court also finds that there is no just reason for delaying the entry of judgment on this claim, and therefore ORDERS that Plaintiffs' interim claim for attorney's fees and expenses through November 19, 1993, be severed and final judgment entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. To the extent any such leave is necessary, the Court grants the parties full leave to immediately appeal this Order to the United States Fifth Circuit Court of Appeals, should they choose to do so. The parties are further ORDERED to file no further pleadings on this issue in this Court, including motions to reconsider or the like. Instead, the parties should seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

IT IS SO ORDERED.

### FINAL JUDGMENT

For the reasons stated in the accompanying Order of this date, the Court now enters Final Judgment as to the claim of the Plaintiffs in this cause for attorney's fees and expenses incurred before and through November 19, 1993.

It is ORDERED that Plaintiffs, through their attorney Alton C. Todd, recover of the Defendants, jointly and severally, the sum of $644,141,99. for attorney's fees and expenses incurred before and through November 19, 1993, with interest thereon at the rate of 3.40 per cent per annum, as provided by law.

This judgment does not affect any other claims of any parties.

THIS IS A FINAL JUDGMENT.

IT IS SO ORDERED.