**D.E. RICE and Karen Rice, as Trustees for the Rice Family Living Trust, Plaintiffs,**

v.

**HARKEN EXPLORATION COMPANY, Defendant.**

**Civ.A.No. 2:97CV00402.**

United States District Court, N.D. Texas, Amarillo Division.

Sept. 30, 1999.

James H. Wood, Law Offices of James H. Wood, Amarillo, TX, for Plaintiffs.

W. Wade Arnold, Peterson Farris Doores & Jones, Christopher L. Jensen, Morris Moore Moss & Douglas, Amarillo, TX, F. Michael Prince, Kelli Michelle Hinson, Carrington Coleman Sloman & Blumenthal, Dallas, TX, for Defendant.

### *ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT*

MARY LOU ROBINSON, District Judge.

The question before the Court is whether the Oil Pollution Act of 1990, 33 U.S.C. §§ 2700 *et seq.,* (OPA) creates a cause of action available to the Plaintiffs under the facts of this case. The Court concludes that it does not. Defendant's motion for summary judgment is therefore granted only as to Plaintiffs' federal cause of action under the OPA, the claimed basis for federal jurisdiction. The balance of Defendant's motion is denied.

#### *Factual Background*

Plaintiffs D.E. Rice and Karen Rice are Trustees for the Rice Family Living Trust. The Trust owns sections 37, 38, and part of 39, Block 47, H & TC Ry. Co. Survey, Hutchinson County, Texas (known as the Big Creek Ranch), except for the oil and

gas under those Sections. Plaintiffs are citizens of the State of Texas.

Harken Exploration Company is a Delaware corporation with its principal place of business in Irving, Texas. Defendant is a citizen of the States of Texas and Delaware.

Harken operates oil-and-gas properties pursuant to leases on Big Creek Ranch. Under these leases, Harken owns and operates structures and equipment on Plaintiffs' land which are used in exploring, drilling, producing, storing, handling, transferring, processing, and transporting oil. Harken has the obligation to act as a reasonable and prudent oil-and-gas producer.

Big Creek, the tributaries of Big Creek, and the surface waters and groundwater on Big Creek Ranch flow into the Canadian River. The Canadian River is the southern boundary of the Ranch, and is downgradient from Harken's oil and gas flowlines, tank batteries, and other production equipment. The Canadian River flows into the Arkansas River, the Arkansas River flows into the Mississippi River, and the Mississippi River flows into the Gulf of Mexico.

### Claims

Plaintiffs allege that Harken has discharged hydrocarbons and continues to discharge hydrocarbons, produced brine, and other pollutants onto the Big Creek Ranch and into a small seasonal creek on Plaintiffs' property known as "Big Creek," "unnamed tributaries of Big Creek," and other "independent ground and surface waters." Plaintiffs allege that through production operation discharges Harken has damaged and continues to damage the land, contaminated and continues to contaminate surface waters and groundwater, threatened and continues to threaten surface waters and groundwater, killed 10 head of their cattle, and damaged and continues to damage their surface vegetation.

Plaintiffs allege that before pollution became unmanageable, they conducted a cow-calf operation on the Ranch, the calves of which were sold into interstate commerce. They allege that Harken's pollution has forced them to re-locate their cattle operations.

Plaintiffs allege that Harken has contaminated or threatened 9,265.24 acre feet of groundwater and over 90 non-contiguous surface acres. They allege that the cost to repair and remediate the surface damages and groundwater is $38,537,-500.00.

Plaintiffs contend that Harken's actions violate the Oil Production Act of 1990(OPA), and that Harken has offered no remediation plan.

The Plaintiffs ask the Court to enter a declaratory judgment that: (a) Harken is a responsible party under the Oil Pollution Act; (b) Harken is liable for the removal of the oil and oil-related pollutants on the property; (c) Harken is liable for the cleanup, restoration, and remediation of the property; (d) Plaintiffs' removal costs incurred through trial are consistent with the OPA's National Contingency Plan; (e) Plaintiffs' proposed removal actions and activities are consistent with the OPA's National Contingency Plan; and (f) they ask the Court to order Plaintiffs' removal and remediation plan be implemented as proposed by Plaintiffs' environmental consultant.

Defendant Harken contends that this Court does not have jurisdiction over Plaintiffs' OPA claims. Defendant contends that it is entitled to summary judgment on any claims brought under the OPA, as well as Plaintiffs' other claims.

### Summary Judgment Standards

"The Court may terminate litigation by rendering a summary judgement where no genuine issue of material fact exists and the moving party is entitled to judgement as a matter of law." *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir.1987) (citations omitted). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548,

2552, 91 L.Ed.2d 265 (1986) (initial burden is on movant to show entitlement to summary judgment with competent evidence); Fed.R.Civ.Pro. 56(c). "Summary judgement disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions." *Honore v. Douglas,* 833 F.2d at 567. This Court must resolve all factual uncertainties and make all reasonable inferences in favor of the nonmoving party. *Bienkowski v. American Airlines,* 851 F.2d 1503, 1504 (5th Cir.1988). Such a finding may be supported by the absence of evidence necessary to establish an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Discussion and Analysis

The OPA was enacted in 1990 in response to the *Exxon Valdez* oil spill in Prince William Sound, Alaska. It represents Congress's attempt to provide a comprehensive framework in the area of marine oil pollution. 136 Cong.Rec. H6933–02, H6944.[1] The OPA focuses on oil discharges in the nation's oceanic fishing grounds, oceans, waterways, bays, and coastlines.[2] *General Electric Co. v. U.S. Department of Commerce,* 128 F.3d 767, 770 (D.C.Cir.1997).

The principal purpose of the OPA is to compensate any party suffering damages from discharges of oil[3] or hazardous substances. S.Rep. No. 94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 722. Congress designed the OPA to provide protection for the environment and to aid the victims of oil spills. *Id.*

When Congress enacted the OPA, it recognized that existing federal and state laws provided inadequate cleanup and damage remedies, required large taxpayer subsidies for costly cleanup activities, allowed third-party damages to go uncompensated, and presented substantial barriers to victims' recoveries such as legal defenses, statutes of limitation, the corporate form, and burdens of proof unfairly favoring those responsible for the spills. *See* S.Rep. No. 94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 722. Congress also recognized that, before the OPA, the costs of cleanup and damage from spills were not high enough to encourage greater industry efforts to

---

**1.** *See also* Francis J. Gonynor, *Dangerous Waters Without a Chart: Pollution Problems as They Relate to Tugs and Barges,* 70 Tul.L.Rev. 549, 552 (1995); J.T. Smith, II, *Natural Resource Damages Under CERCLA and OPA: Some Basics for Maritime Operators,* 18 Tul. Mar.L.J. 1, 6 (1993) ("Indeed, the *Exxon Valdez* spill was a principle catalyst for the enactment of OPA in 1990.").

**2.** The legislative history of OPA includes statements such as: "This new law, the Oil Pollution Act, is the latest in what I believe is an impressive record of significant marine environmental protection laws which have been developed in the Merchant Marine and Fisheries Committee and approved by this Congress." 7136 Cong.Rec. E3021–03 (Jones, W.). "The Oil Pollution Act will provide the assurance we need for the future that we can keep our bays and harbors clean, our wildlife safe, and our beaches free of oil." 8136 Cong.Rec. H6942, (Schneider, H.). "The primary goal of this legislation is to prevent oil spills from occurring in the future. We must make every effort to ensure that accidents like the *Exxon Valdez* and the *Mega Borg* do not happen again and that our waterways are free from the ravages of oil," 9136 Cong.Rec. H6933–02, H6940 (Fields, J.). Pursuant to these comments, the EPA interpretation of the Act, and the language of the Act, discharges of oil onto land surfaces, rather than just directly into ocean waters, are covered by the OPA. Section 2702(a) of the Act states:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters ..., is liable for the removal costs and damages....

**3.** The definition of "oil" in the OPA includes oil mixed with saltwater or produced brine, a naturally occurring waste product in the production of oil. Section 2701(23) of the OPA states: "oil" means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, *sludge, oil refuse, and oil mixed with wastes*.... (emphasis added).

prevent spills and develop effective techniques to contain them. *Id.* When it enacted the OPA, Congress intended to create a law that would compensate victims of oil spills; provide quick, efficient cleanup; minimize damage to fisheries, wildlife, and other natural resources; and internalize costs of oil spills within the oil industry. *Id.*

Liability under the OPA is strict. In pertinent part, Section 2702 of the OPA provides:

[E]ach responsible party for a ... facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters ... is liable for the removal costs and damages....

33 U.S.C. § 2702(a); *see also* 33 U.S.C. § 2701(17) ("liable" or "liability" shall be construed to be the standard of liability under the *Clean Water Act*).

Under the OPA, a person owning or operating a vessel, an onshore or offshore oil facility, a deepwater port, or a pipeline is liable for certain costs and damages if the facility or vessel has discharged oil, or poses a substantial threat of a discharge of oil or other waste pollutants into or upon this nation's navigable water or adjoining shorelines or the "exclusive economic zone."[4] 33 U.S.C. §§ 2701(32), 2702(a). The OPA thus provides that a responsible party for an onshore facility from which oil is discharged, or which poses a substantial threat of a discharge of oil, into or upon navigable waters is liable for removal costs and other damages resulting from such incident. 33 U.S.C. § 2702(a).

A pre-suit notice provision states: "all claims for removal costs or damages shall be presented first to the responsible party ... of the source designated under section 2714(a) of this title." 33 U.S.C. § 2713(a). If such a claim is presented and the re-

sponsible party denies all liability or if the claim is not settled within 90 days the claimant may elect to commence an action in court against the responsible party. 33 U.S.C. § 2713(c). Plaintiffs have timely made a proper pre-suit notice and offer in this case.

■ Under the OPA, a plaintiff must prove two elements: 1) that there is a discharge of oil or covered oil-related substances, and 2) that the discharge either went into navigable waters or poses a substantial threat to navigable waters of the United States. If plaintiff proves these elements, he recovers all damages that result from the discharge, *see* § 2702(2), including removal costs incurred, § 2701(31); the costs to prevent, minimize, or mitigate oil pollution, *id.;* any reasonable assessment costs, § 2701(5); the costs to replace personal property or the diminution in value to personal property, *see* § 2702(b)(2)(B); and the costs to repair, restore, and remediate real property or the diminution in value to the property. *See id.*

The definition of "navigable waters" is essential to interpretation of the scope of the Act. The OPA and its related regulations define navigable waters to mean "the waters of the United States, including the territorial sea." 33 U.S.C. § 2701(21); 15 C.F.R. § 990.11 *et seq.* Although no court has precisely defined the term "navigable waters" in the context of OPA, that term has been used in connection with federal admiralty law for decades.

The term "navigable waters" means, for the purposes of admiralty jurisdiction, "a body of water which, in its present configuration, constitutes a highway of commerce, alone or together with another body of water, between the states or with foreign countries over which commerce in

4. For purposes of the OPA, the "exclusive economic zone" means the zone established by Presidential Proclamation Number 5030, dated March 10, 1983, including the ocean waters of the fishing areas referred to as "eastern special areas" in Article 3(1) of the Agreement between the United States of America and the Union of Soviet Socialist Republics on the Maritime Boundary, signed June 1, 1990. 33 U.S.C. § 2701(8). There is no contention in this case that an "economic zone" is implicated.

its current mode is capable of being conducted." *Johnson v. Colonial Pipeline Co.,* 830 F.Supp. 309, 312 (E.D.Va.1993). The Supreme Court has held that the test for whether a body of water is navigable is whether the body of water "in its natural state, is used, or capable of being used, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel in the water." *Economy Light & Power Co. v. United States,* 256 U.S. 113, 121–22, 41 S.Ct. 409, 65 L.Ed. 847 (1921). It is uncontested that Big Creek is not a navigable waterway under this definition.[5]

Plaintiffs therefore urge the Court to apply the definition of "navigable waters" as used in the Clean Water Act (CWA). The term "navigable waters" has been broadly interpreted under the CWA. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (upholding regulations adopted by Army Corps of Engineers, which included wetlands within the CWA's scope of "navigable waters"). There is agency support for Plaintiffs' interpretation. The U.S. Environmental Protection Agency interprets "navigable waters" under the OPA to mean the same as "navigable waters" under the Clean Water Act. According to the EPA:

### What are navigable waters?

"Navigable waters" are broadly defined under the *Clean Water Act* and *Oil Pollution Act* to include all waters that are used in interstate or foreign commerce, all interstate waters including wetlands, and all intrastate waters, such as lakes, rivers, streams, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds. Essentially, the term navigable waters refers to any natural surface water in the U.S.

*EPA Emergency Response Program: Oil Spill Prevention, Preparedness & Response* (http://www.epa.gov/oilspill/faqs/termfaqs.htm) (emphasis in original).

The CWA and the OPA employ similar definitions of "navigable waters." Like the OPA, the scope of the CWA is governed by the impact or potential impact of a discharge on "navigable waters." *See* 33 U.S.C. §§ 1311 & 1362(12) (West 1997). "Navigable waters" are defined under the Clean Water Act as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7) (West 1997). The same wording is used in the OPA, which defines "navigable waters" as "the waters of the United States, including the territorial sea." § 2701(21).

The CWA regulations define navigable waters as including:

(a) All waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters that are subject to the ebb and flow of the tide;

(b) Interstate waters, including interstate wetlands;

(c) All other waters such as intrastate lakes, rivers, *streams (including intermittent streams),* mudflats, sand flats; and wetlands, the use, degradation, or destruction of which *would affect or could affect interstate* or foreign *commerce including any such waters:*

(1) *That are or could be used by interstate or foreign travelers for recreational or other purposes;*

(2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce;

(3) *That are used or could be used for industrial purposes by industries in interstate commerce;*

(d) All impoundments of waters otherwise defined as navigable waters under this sections;

(e) *Tributaries of waters identified in paragraphs (a) through (d) of this section,* including adjacent wetlands; and

---

**5.** It is not disputed that this narrower definition, urged by Harken in this case, applies in other contexts—such as whether federal admiralty jurisdiction exists over an alleged maritime tort. *See, e.g., Price v. Price,* 929 F.2d 131 (4th Cir.1991). This lawsuit does not involve admiralty jurisdiction.

(f) Wetlands adjacent to waters identified in paragraphs (a) through (e) of this section;

Provided, that waste treatment systems (other than cooling ponds meeting the criteria of this paragraph) are not waters of the United States.

40 C.F.R. § 110.1 (emphasis added).

The definition found in the OPA regulations defines navigable waters simply as "waters of the United States, including the territorial sea, as defined in section 1101(21) of OPA (33 U.S.C. § 2701(21))." 15 C.F.R. § 990.30. These regulatory definitions support the expansive construction of the term "navigable waters" urged by Plaintiffs.

Case law defining the scope of "navigable waters" under the Clean Water Act shows that the term has a very broad meaning. In *Avoyelles Sportsmen's League, Inc. v. Marsh*, the Fifth Circuit explained that Congress intended for "navigable waters" to be given the broadest possible constitutional interpretation. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 914 (5th Cir.1983) (quoting S.Conf.Rep. No. 1236, 92nd Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3776, and 3822).

In *Hanson v. United States*, 710 F.Supp. 1105, 1108 (E.D.Tex.1989), the court explained that "navigable waters" means all waters of the United States, including all non-navigable waters whose misuse might affect interstate commerce:

It is well established ..., that the term navigable waters means all "waters of the United States," comprising not only traditionally navigable waters, but all other waters interconnected therewith, including the territorial sea and all non-navigable intrastate tributaries whose misuse might affect interstate commerce.

*United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir.1979), is also instructive. *Earth Sciences* involved a non-navigable creek that was not used to transport any goods or materials. Defendant Earth Sciences, Inc. sought to use the same definition of "navigable waters" as Defendant Harken urges here. Earth Sciences, Inc. argued that the creek was not a navigable water subject to regulation under the Clean Water Act. The Court of Appeals rejected the argument. *Id.* at 374–375. The court held that "navigable waters" includes every creek, stream, river, or body of water that in any way may affect interstate commerce.[6]

**6.** As the 10th Circuit Court of Appeals stated in *Earth Sciences, Inc:*

It is argued that the [creek] is not a "navigable water" subject to regulation under the [Clean Water Act]. At first blush that argument appears to be plausible. It was stipulated by the parties that the [creek] is not navigable in fact nor is it used to transport any goods or materials. It is located entirely in Costillo County, Colorado, and below this operation are two reservoirs which collect all of the stream flow to be used for recreation and agricultural irrigation.

[The defendant] would have us review [the Clean Water Act] in terms of the traditional meaning of "navigable waters," as construed in the line of cases beginning with The *Daniel Ball*, 77 U.S.(10 Wall.) 557, 19 L.Ed. 999 (1870). But the conference committee resolving differences between the Senate and House versions of the [Clean Water Act] ... eliminated the word "navigable" from in front of "waters" in the House bill; thus "navigable

waters" was defined as "the waters of the United States, including the territorial seas." The conference report noted the change and declared the term should "be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." Sen. Conf.Rep. No. 92—1236, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News pp. 3668, 3776, 3822.

It is stipulated by the parties that the stream supports trout and some beaver, the water collected in the reservoir is used for agricultural irrigation, and the resulting products are sold in interstate commerce. *It seems clear Congress intended to regulate discharges made into every creek; stream, river or body of water that in any way may affect interstate commerce.* Every court to discuss the issue has used a commerce power approach and agreed upon that interpretation.

... [The defendant] argues the [creek] does not provide a very significant link in the chain

Plaintiffs urge this Court to apply the same expansive reading of the term "navigable waters" as used in the CWA.[7] Given the expansive language of the CWA and the EPA, the similarity of the terms used by Congress in the CWA and the OPA, and the fact that both are remedial legislation, Plaintiffs present a strong argument. However, it is clear from the legislative history and the few published OPA decisions discussing "navigable waters" that application of the Act to an onshore oil production facility that is over 500 miles from any ocean or shoreline is an expansion that Congress did not intend.

No published opinions have definitively construed the scope of "navigable waters"

under the OPA. District Judge Samuel Kent of the Southern District of Texas ruled that discharges of oil into Chigger and Cowart Creeks, two creeks that flow directly into Clear Lake, which is a navigable bay on the Gulf of Mexico, would be sufficient to invoke the provisions of the OPA. Judge Kent stated that oil discharges into such creeks could pose a substantial threat of discharge into or upon the navigable waters or adjoining shorelines. *Avitts v. Amoco Production Co.*, 840 F.Supp. 1116, 1122 (S.D.Tex.1994), *rev'd on other grounds*, 53 F.3d 690 (1995).[8]

Judge Kent went on to state, however:

---

of interstate commerce. The stipulation of facts indicates at least some interstate impact from this stream and that is all that is necessary under the [Clean Water Act]. We hold the [creek] is covered by the [Clean Water Act's] definition of navigable waters.
599 F.2d at 374–75 (emphasis added).

**7.** Other courts have upheld a similarly expansive interpretation of "navigable waters" in ruling that waters not traditionally considered navigable fall within the Clean Water Act's coverage. *See, e.g., United States v. Pozsgai*, 999 F.2d 719, 731 (3d Cir.1993) (Congress intended to give the term "navigable waters" the broadest possible constitutional interpretation), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1052, 127 L.Ed.2d 373 (1994); *Quivira Mining Co. v. U.S. E.P.A.*, 765 F.2d 126, 130 (10th Cir.1985) (non-navigable creeks and "arroyos" affect interstate commerce because during times of intense rainfall there could be a surface connection between these waterways and navigable streams), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *U.S. v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1329 (6th Cir.1974) (Act constitutionally applies to discharge of oil into non-navigable tributary three waterways removed from navigable river); *Sierra Club v. Colorado Refining Co.*, 838 F.Supp. 1428, 1434 (D.Colo. 1993) (The Clean Water Act applies to discharges which reach "navigable waters" through groundwater); *Residents Against Industrial Landfill Expansion v. Diversified Systems, Inc.*, 804 F.Supp. 1036, 1039 (E.D.Tenn. 1992) (tributary of creeks can be considered navigable waters under the Clean Water Act); *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181, 1187 (D.Ariz.1975) (for the Clean Water Act to be effectively carried out, the scope of its control must extend to all pollutants discharged into "any waterway,"

including normally dry arroyos, where any water which might flow therein could reasonably end up in any body of water to which or in which there is some public interest, including underground waters).

**8.** Judge Kent explained:

The [oil polluters] further maintain that the [OPA] is inapplicable because Chigger and Cowart Creeks are not themselves navigable waters. This argument, however, proposes an unduly narrow interpretation of the Act.... A construction of the statute which would limit its application strictly to pollutants discharged directly into navigable waters would unjustifiably thwart the Act's aim of remediating *all* causes of [oil] contamination. Indeed, under the [oil polluter's] interpretation, a polluter located directly on the ship channel could take itself out of the scope of the Act simply by removing its contaminating drain-pipe from its dock and placing it in the ditch running behind the plant, claiming that it is no longer directly discharging into navigable waters.

Such a narrow reading of the OPA would unnaturally distort the Act's clear language. While the Act specifically provides for the liability of shore-based facility owners to the owners of real property damaged by the facilities' pollutants, *nowhere does it indicate a requirement that either the facility or the property be located adjacent to, or even near to, navigable waters....* The West Hastings Field being located in the drainage basin of Clear Lake, it necessarily follows that any large-scale surface or near-surface discharges in the field pose a substantial threat to Clear Lake's water quality.
*Id.* at 1122 (first emphasis in original)(second emphasis added).

The Court recognizes that this analysis becomes more difficult to apply as the subject oil fields become further from shore. At some point the fields' arguable proximity to the drainage systems which ultimately feed into navigable waters only after great distance will provide simply too remote a threat to bring the action within the strictures of the OPA.

*Id.* Harken's oil fields in Hutchison County are such fields—fields located so far from oceans, bays, shores, or beaches that any discharge of oil is simply too attenuated a threat to "navigable waters" to be covered by the OPA. While there is evidence that Harken considered its oil operations to be governed by the OPA insofar as the Act required EPA reports on small spills,[9] such precautionary reporting does not provides jurisdiction under the facts of this case.

The Fifth Circuit reversed Judge Kent's decision on other jurisdiction grounds. The Fifth Circuit, however, went on to state that it is "highly questionable whether the OPA would apply" under the facts of *Avitts.* *Avitts v. Amoco Production Co.,* 53 F.3d 690, 693 (5th Cir.1995). The waterways involved in *Avitts* were hundreds of miles closer to the ocean and shorelines that the seasonable creeks and groundwater in this case.

■ The Panhandle of Texas is hundreds of miles from costal waters or ocean beaches. Discharges of oil and salt water onto land in the Panhandle of Texas are not the type of oil and waste-water spills targeted by the OPA. While pollution into Big Creek and the tributaries of Big Creek, into groundwater under Plaintiffs' land, and perhaps eventually into the Canadian River may affect interstate commerce,[10] Plaintiffs have no Oil Pollution Act cause of action under the facts of this case.

Plaintiffs declaratory judgment claims are dependent upon there being a viable OPA cause of action. Therefore that cause of action must also be dismissed.

### Conclusions

Defendant Harken's motion for summary judgment is granted only as to Plaintiffs' federal claims brought pursuant to the Oil Pollution Act of 1990.

The OPA being the sole claimed source of federal jurisdiction, this Court will not exercise supplemental jurisdiction over any of the state-law based claims asserted in this lawsuit.

Final judgment will be entered in accordance with this order.

It is SO ORDERED.

9. In 1997, Harken prepared a Spill Prevention Control and Countermeasure Plan (SPCC Plan) for its Panhandle properties, including Big Creek Ranch. *See* Plaintiffs' Exhibit # PA1058–PA1204. Joe H. Clark, P.E., who was then Harken's senior vice president, approved the SPCC Plan and certified it. Harken's Plan states:

> *In accordance with 40 CFR 112,* Harken Exploration Company (HEX) has prepared the following Spill Prevention and Countermeasure Plan (SPCC Plan) for its Texas Panhandle operations *located in Hutchinson County, Texas.*

PA1059 (emphasis added). Part 112 of Title 40 of the Code of Federal Regulations requires spill reports from only owners or operators of onshore and offshore facilities who have discharged oil into or upon navigable waters. 40 C.F.R. § 112.3(a) (West 1998). In addition, in May of 1997 an oil rig overturned on land next to the Rices' land, spilling diesel fuel into a tributary of Big Creek. When asked the "Estimate of Quantity spilled into *Navigable Waters,*" David Gaddis, Harken's field supervisor and the designated person in charge of oil spill prevention (*see* PA1060), answered, "10 gallons." PA1134 (emphasis added).

10. For example, like the creek in *Earth Sciences,* creeks on the Rices' ranch allegedly supplied water to their cow-calf operation, with Plaintiffs' calves being sold in interstate commerce.