**Nathan SMITH, Plaintiff,**

v.

**THE ABANDONED VESSEL, in rem.**

**Civil Action No. H–07–784.**

United States District Court,
S.D. Texas,
Houston Division.

April 27, 2009.

Richard A. Schwartz, Adraon D. Greene, Schwartz Junell Greenberg and Oathout LLP, Houston, TX, for Plaintiff.

Ronald B. Walker, Terry M. Carroll, Jr., Walker Keeling and Carroll, LLP, Victoria, TX, for Intervenor Marie O'Connor Sorenson.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

DAVID HITTNER, District Judge.

On December 29, 2008, the Court commenced a non-jury trial in the above entitled matter. During the course of the two-day proceeding, the Court took evidence and heard sworn testimony. Having considered the evidence, testimony and oral argument presented during the trial, post-trial submissions, and applicable law, the Court now enters the following findings of fact and conclusions of law.[1] Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## INTRODUCTION

This is an *in rem* action brought under the Court's admiralty jurisdiction. Plaintiff Nathan Smith ("Smith"), a self-described "musician by birth" turned movie director, music producer, and treasure hunter from Los Angeles, California,[2] claims to have discovered a lost barkentine treasure ship from the 1820s near a small lake in Refugio (pronounced re-fury-oh) County, Texas.[3] Smith seeks title to the vessel under the law of finds, or alternatively, the right to salvage it and obtain a just award under the law of salvage. Further, Smith seeks an order enjoining all

---

1. The Court, as the sole fact finder, is tasked with evaluating the credibility of the witnesses at trial and determining which testimony is more credible. *See Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000); *Ruiz v. Estelle*, 679 F.2d 1115, 1131, *amended in part and vacated in part*, 688 F.2d 266 (5th Cir.1982) ("[I]n a bench trial the assessment of witness credibility is inherently [the Judge's] province.").

2. Smith testified that he has played guitar since he was four years old. He also testified that he plays drums and keyboards and has played with famous musical artists such as Junior Wells, Buddy Guy, and Fleetwood Mac. In addition, Smith attended the Los Angeles Recording School and knows how to run a recording studio. Smith admitted that his music and movie ventures have been unprofitable—he has made no profit from these ventures since 1990. In addition, Smith stated that he creates websites for pawnshops and "legalized marijuana sites," but this business also has failed to score a profit. Smith's sole source of income is funds from individuals investing in his movie, music, and treasure hunting ventures.

3. A barkentine (or barquentine) ship is a type of three-masted sailing vessel. Smith also contends that he has located many other famous lost treasures, including: (1) the Franklin Mountains treasures; (2) Belle Starr's Iron Door; (3) the Lost Dutchman Mine; (4) Peg-leg's Lost Mine; and (5) Jesse James's Lost Treasure. However, Smith admits that he has yet to recover any of the treasures he has located. According to Smith, most of these treasure locations are in very dangerous, secluded areas and protected by "death-traps." For instance, Smith testified that the location of Jesse James's buried loot is protected by a deathtrap created by a massive stone balanced on a smaller stone. Smith describes the large stone as being about half the size of the undersigned's courtroom, which measures forty-three feet by forty-eight feet.

others from obstructing him from proceeding with his recovery efforts. Finally, Smith asserts that Intervenor Marie Sorenson ("Sorenson") lacks standing to contest his claims because Sorenson failed to file a verified claim to the vessel.[4] Sorenson, owner of the land under which Smith claims the vessel is located, contests the existence of the alleged vessel and the Court's jurisdiction and moves the Court to dismiss the case for lack of subject matter jurisdiction.

## FINDINGS OF FACT

1. Smith first became interested in treasure hunting when he and a colleague ran out of money while producing a movie.[5]

2. Inspired by the film *National Treasure,* starring Nicolas Cage, Smith determined to fund his movie venture by hunting for and finding lost and hidden treasures.

3. Shortly thereafter, Smith discovered the book *Lost Treasures of American History* by W.C. Jameson ("Jameson") while browsing in a Borders bookstore. In the book, Jameson recites the legend of Barkentine Creek in Refugio County, Texas.

4. According to the legend, sometime around 1822, four Spanish treasure ships laden with casks of gold and silver set sail from Vera Cruz, Mexico bound for Galveston, Texas on their way to Spain to deliver their bounty to the King.

5. Unfortunately, during the voyage the fleet encountered a hurricane. Three of the ships were lost in the storm.

6. However, the captain of the fourth vessel, in an attempt to outmaneuver the storm and avoid the fate of his three *camaradas,* navigated his barkentine inland from the Gulf of Mexico, into Copano Bay, up the Mission River, and further into a creek, where she ran aground.

7. Legend has it the captain and crew then abandoned the ship and encountered a tribe of native cannibals known as the Karankawas. The Spaniards quickly met an ignominious demise.

8. Some fifty years later, the story goes, Comanche Indians discovered the vessel, which by then was partially buried in the stream.

9. The Comanches discovered the vessel's rich cargo and took some of the gold for themselves. But they, too, soon became dinner for the Karankawas.

10. It is said, however, the Comanches who found the gold buried it during the battle and it remains buried there to this day.

11. Later, one of the early settlers of the area, a man named Nicholas Fagan, reportedly found the remnants of the lost ship and took lumber and iron off of it to build a house, not knowing of the vast treasure buried below his feet.

12. In *Lost Treasures of American History,* Jameson claims the vessel ran aground in Barkentine Creek in Refugio County. Jameson wrote that the finder of the lost barkentine would "possess wealth beyond imagining."

13. The legend of Barkentine Creek and its namesake has been told by many others throughout the years, including Tom Townsend in *Texas Treasure Coast,* an article in the *Victoria Advocate,* and an article entitled *Nicholas Fagan, Texas Patriot* written in 1958 by Mrs. Tom O'Connor.

14. Upon reading Jameson's account, Smith became determined to find the lost

---

4. On May 12, 2008, the Court substituted Morgan Dunn O'Connor, executor of Marie Sorenson's estate, as Intervenor upon Sorenson's death.

5. According to Smith, his colleague, a securities attorney, is preparing an Initial Public Offering for investors seeking to get in on the raising of the abandoned vessel.

barkentine, despite having no previous training or experience in historical research, map-reading, general navigation, or locating and salvaging lost treasures or abandoned shipwrecks.

15. Smith first looked at satellite images of Barkentine Creek on the Internet and saw it did not connect to Mission River. Smith surmised the barkentine must have gone into a different creek.

16. Smith next obtained an 1851 map of Refugio County from the Texas General Land Office and compared it to recent satellite images obtained from Google Earth and other sources.

17. Smith noticed that the 1851 map showed Melon Creek running from north to south directly into Mission River.

18. The later satellite images showed a change in direction of Melon Creek.

19. Instead of running in a straight line directly from north to south, Melon Creek diverted to the east and then back to the west and south into Mission River.

20. Smith asked himself what might have caused this change of direction.

21. Using Google Earth, Smith detected an image he believes to be the shape of a vessel situated near the southern shore of Melon Lake and between Melon Lake and Mission River. Smith believes this "shoe-print" shape is the wreckage of the abandoned barkentine.[6]

22. By extrapolating from the satellite image, Smith identified the area in which he believes the abandoned vessel lies as a rectangular area approximately six-hundred square feet in size (the "Work Area"), which is positioned between Mission River and Melon Lake.

23. Melon Lake lies to the north of Mission River.

24. Melon Creek runs from north to south on the eastern edge of Melon Lake and enters Mission River.

25. Mission River generally flows southward into Mission Bay, which opens into Copano Bay and the Gulf of Mexico.

26. Melon Lake is connected to Melon Creek via a slough or tributary (the "Tributary").[7]

27. Smith consulted with a purported barkentine reconstruction specialist in Michigan and a magnetometer company and provided each his satellite images.

28. Those conversations reinforced Smith's belief that he had found a buried vessel in that area.

29. Smith has been to the location of the alleged abandoned vessel on four occasions.

30. In October of 2005, Smith went to the site for the first time.

31. Smith and a companion, Katherine Brown ("Brown"), initially went to the area of Mission River looking for the alleged shipwreck but forgot to take any maps to locate the specific site and did not have a Global Positioning System ("GPS") device to find the coordinates.

32. Smith and Brown arrived at Mission Bridge near midnight. They initially planned to swim Mission River in order to get to the area of the alleged shipwreck, but they decided against it and waited until dawn to cross the river.

33. The next morning they found an "abandoned" flat-bottom rowboat, com-

---

**6.** Smith claims satellite cameras can take photographs into the ground to determine what is buried below the surface but provides no basis for this claim other than his own testimony.

**7.** During trial, the parties referred to the Tributary as a slough, sloughway, and channel. Regardless of its technical name, the Court refers to this waterway that connects Melon Lake to Melon Creek as the Tributary.

plete with oars, on the shore of Mission River.

34. Smith and Brown reached the site of the alleged abandoned vessel using the rowboat they "borrowed." They rowed up Mission River, into Melon Creek, into the Tributary, and then into Melon Lake.

35. Within one-hundred feet of the area in which Smith claims the alleged vessel rests, the water is shallow, about six inches to one foot deep, so Smith got out of the rowboat and walked through the water about one-hundred feet to the alleged vessel's location.

36. Smith believes he found the alleged shipwreck's location because no vegetation grows in the area—due to, Smith asserts, creosote from the ship's lumber—and because there is a distinct marking upon the ground that Smith claims has the appearance of a vessel's "capstan." [8]

37. On Christmas of 2006, Smith again went to the site of the alleged vessel. That time, Smith and Brown, along with Alan Mezaratti, drove from Los Angeles directly to the town of Refugio, Texas. They stayed in a hotel in Refugio and went to the site the next morning.

38. The trio walked along the edge of Melon Lake from the Highway 2678 bridge to the alleged vessel's location.

39. According to Smith, the water was about four to five inches deep at the alleged vessel's location.

40. Smith also took a metal detector, which, he claims, showed gold and silver readings over the area under which he claims the vessel lies.

41. According to Smith's testimony, these metal detector readings confirmed that the alleged vessel and its rich contents extended northward into Melon Lake.

42. On this second trip, Smith had a camera with which he took photographs of the location to document his discovery. However, these photographs were lost in a computer hard-drive crash and none were offered as evidence.

43. In October 2007, Smith returned to the location for a third time, again with a metal detector and also a video camera. Smith made a video of the location and the metal detector readings, which again, he claims, demonstrated the existence of gold and silver at the location.

44. Unfortunately, the video taken on this third trip to the location also was lost in the computer hard-drive crash that destroyed the earlier-taken still photographs.

45. Smith also testified that on this trip he found a small piece of wood with what appeared to be saw marks.

46. Indeed, Smith produced a photocopy of a blurry photograph of what he claims is the piece of wood he procured at the alleged vessel's location.

47. Smith stated that he took the specimen to California and his friend tested it by placing it in a microwave oven for a few seconds.

48. Smith testified that the wood began smoking, an indication that it was soaked in creosote. According to Smith, creosote was put on ships in the 1600s and 1700s and burned in order to remove plankton and barnacles.

49. Smith, however, did not produce the original piece of wood at trial or the original photograph of it. [9]

---

8. A capstan is a "mechanical device used chiefly on board ships or in shipyards for moving heavy weights by means of ropes, cables, or chains." THE NEW ENCYCLOPEDIA BRITANNICA MICROPEDIA 837 (15th ed.1994).

9. According to Smith, he placed the specimen in a safe location in a warehouse owned by his friend's company. Apparently, Smith's friend sold the company and the warehouse in which the wood was stored and, much like

50. Nor did Smith produce any other artifact or tangible item as evidence of his discovery.

51. Finally, in December 2008, Smith went to the site with his Houston attorney, Richard Schwartz ("Schwartz"), and a retained expert, retired U.S. Coast Guard Commander David Cole ("Commander Cole").

52. Smith hired an airboat to take Smith's party from Mission River, into Melon Creek, through the Tributary, and into Melon Lake. Smith went to Melon Lake two times that day, and he videotaped the journey.

53. The Court viewed the video of that trip. It shows the entire journey. Although the water was very low in the lake and at the entrance to the lake from the Tributary, Smith's boat was able to navigate from Melon Creek, through the Tributary into Melon Lake.

54. Other photographs in evidence show the Tributary and Melon Lake to be quite full on other occasions.

55. There was no standing water over the alleged abandoned vessel's location, but it was very muddy.

56. The flat-bottomed airboat became stuck before reaching the site where Smith believes the vessel is located.

57. Although in his initial complaint Smith identifies the area in which he claims the alleged vessel rests by GPS coordinates, Smith testified that he did not use a GPS device on any of his trips to the location because he believes the U.S. Military intentionally makes GPS inaccurate by up to one-half mile for "security reasons."

58. Sorenson provided to Smith a survey of Sorenson's property (the "Sorenson Survey"). This survey includes Mission River, Melon Creek, and Melon Lake.

59. On the Sorenson Survey, the boundary of Melon Lake is indicated with a dashed line. Although this dashed line does not show "calls" or actual survey points, it is a survey provided by Sorenson showing the boundary of Melon Lake.

60. Smith overlayed the Sorenson Survey on top of a Google Earth image and a U.S. Geological Survey map. This overlay shows the location of the alleged abandoned vessel, according to Smith, to be within the lateral surface of Melon Lake.

61. Other evidence, including witness testimony and numerous aerial photographs, establishes that the boundary of Melon Lake expands and contracts depending on how much water is in the lake.

62. Furthermore, Smith is not the only person to travel to and into Melon Lake by boat. Smith frequently saw people fishing in Melon Lake.

63. A local resident, Garrett Engelking ("Engleking"), traveled to Melon Lake by boat to go fishing four to five times in the last few years using a twenty-foot Carolina Skiff.

64. On one occasion, Engelking traveled from Mission River, to Melon Creek, through the Tributary, into Melon Lake, out a different tributary, and back into Melon Creek to fish in lakes north of Melon Lake. Engelking traveled back the same way.

65. It is undisputed that Mission River and Melon Creek are navigable waters. The Corps of Engineers ("the Corps") has made this determination, and it is not contested here.

66. The Court heard from two experts regarding the Tributary between Melon Creek and Melon Lake.

67. Smith offered the testimony of Commander Cole. Sorenson offered the

the photographs and the video, the specimen was lost.

testimony of retired U.S. Coast Guard Captain William Wagner ("Captain Wagner").

68. Captain Wagner testified he traveled the area waterways, that Melon Creek was blocked by a low bridge, and the only connecting waterway available between Melon Lake and Melon Creek downstream of the low bridge was a single narrow channel (the Tributary).

69. Captain Wagner testified that he attempted to negotiate the Tributary between Melon Creek and Melon Lake in a boat with an eight inch draft and ran aground.

70. Captain Wagner measured the depths of the water in the Tributary and testified that a commercial vessel could not travel through the channel or to Melon Lake in the ordinary condition of the waters.

71. Although Captain Wagner testified on direct exam that the Work Area Smith designated to the Corps was not navigable, he admitted on cross examination that Smith asked the Corps to determine whether the Work Area is navigable waters of the United States and the Corps made that finding.

72. Captain Wagner testified that one cannot get from Melon Lake to Melon Creek in the water's ordinary condition in a customary vessel as used in commercial trade and travel conducted by water but then admitted on cross examination that the Tributary was navigable.

73. Captain Wagner testified that Melon Lake is not navigable under normal conditions, but the Court does not agree.

74. Although Captain Wagner had a distinguished career with the U.S. Coast Guard, he has no prior experience (as part of any assignment he held at the Coast Guard) in determining if a waterway is navigable.

75. Sorenson's attorney supplied Captain Wagner with the definition of navigable water, including such terms as "waters in their ordinary state" and whether the water could be used for "commercial activity" in its normal state.

76. Captain Wagner made no study of what these terms meant. He was not asked to use, nor did he use, the Coast Guard's or Corps' regulations that define navigable waters.

77. Nor did Captain Wagner rely on a judicially articulated test of navigability as it relates to admiralty jurisdiction.

78. Captain Wagner did not take into account the soil survey the Corps relied upon in making its determination that the Work Area included navigable waters.

79. The soil survey shows the area to be frequently flooded by fresh and salt water.

80. Moreover, Captain Wagner did not take into account the fact that two pipelines run through the middle of Melon Lake, or the finding by the Corps that the Work Area is a navigable water of the United States under the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 401, *et. seq.*

81. Captain Wagner did not attempt to determine the lateral boundary of the surface of the Melon Lake or make a reasonable effort to determine whether the area of the alleged abandoned vessel is within that boundary.

82. Although he went to a location indicated by GPS coordinates as the alleged vessel's location, Captain Wagner did not attempt to verify that the location was correct by reference to Smith's description of the Work Area.

83. On the other hand, Commander Cole testified that the narrowest portion of

the Tributary between Melon Creek and Melon Lake was eight feet wide.

84. Commander Cole opined that motorized boats could traverse the Tributary, although they may have to perform a "back and fill" maneuver to negotiate the turns.

85. Commander Cole conceded that two boats could not pass each other at the narrowest points.

86. Commander Cole's previous job in the Coast Guard included conducting navigability studies and making navigability determinations using the Coast Guard's and Corps' regulations.

87. Commander Cole used the same regulations and methodology as he used in the Coast Guard in rendering his opinion in this case.

88. Commander Cole, based his opinion on navigability of Melon Lake on his experience in making navigability determinations in the Coast Guard, on the Corps' and Coast Guard's regulations, and on his understanding of the vessel's alleged location.

89. Commander Cole opined that the designated site of the shipwreck (the Work Area) is in navigable waters.

90. Finally, Smith observes the vessel location by satellite and has had security observing the vessel location, and no other person has attempted to conduct any salvage operations or asserted any possession over the alleged vessel.

91. Smith does not have a contractual duty to salvage the alleged vessel.

92. Smith's efforts to this point have been completely voluntary.

93. Sorenson has made no effort to salvage the alleged vessel.

## CONCLUSIONS OF LAW

### A. Admiralty Jurisdiction

94. As an initial matter, Sorenson contends the Court lacks subject matter jurisdiction because the alleged abandoned vessel's location is not in navigable waters so as to invoke the federal court's admiralty jurisdiction. Therefore, Sorensen asserts, Smith's claims should be dismissed for want of subject matter jurisdiction.

95. "Federal courts are courts of limited jurisdiction." *United States v. Hazlewood*, 526 F.3d 862, 864 (5th Cir.2008); *Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1102 (5th Cir.1981).

96. "There is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Roby v. State Farm Fire & Cas. Co.*, 464 F.Supp.2d 572, 575 (E.D.La.2006). It is the plaintiff's burden to establish that subject matter jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981).

97. However, federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1); *see California v. Deep Sea Research, Inc.*, 523 U.S. 491, 501, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998).

98. The federal courts' admiralty jurisdiction has been defined historically in terms of navigability. *See Kaiser Aetna v. United States*, 444 U.S. 164, 171–72 n. 7, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (citing *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851)).

99. Consequently, the parties argue, and the Court agrees, that the critical question the Court must first answer is whether the location of the alleged vessel is reachable by a navigable waterway of

the United States so as to invoke this Court's admiralty jurisdiction.

*Navigable Waters*

100. There are several definitions of navigability, each one of which has been developed for a particular judicial or administrative purpose. *See Kaiser Aetna,* 444 U.S. at 171–72 & nn. 6–7, 100 S.Ct. 383 (comparing the many articulated definitions of navigability and navigable waters and their distinct contextual applications, including those for purposes of: (1) a navigational servitude; (2) Congress's power to regulate under the Commerce Clause; (3) the Corps of Engineers administrative authority; and (4) federal courts' admiralty jurisdiction).

101. For instance, the Corps, for purposes of delineating its authority under the RHA, defines navigable waters as

those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

33 C.F.R. § 329.4 (2009).

102. However, the United States Supreme Court has concluded that under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.,* navigable waters include

only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes.' The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

*Rapanos v. United States,* 547 U.S. 715, 739, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (internal citation omitted).

103. Furthermore, in defining the scope of Congress's regulatory authority under the Interstate Commerce Clause, U.S. CONST. art. I, § 8, the United States Supreme Court articulated a test for navigable waters of the United States:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

*The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870).

104. Moreover, in delimiting the boundaries of a navigational servitude, the United States Supreme Court made clear that a waterway must be naturally navigable and not made so artificially, thus "implicitly rejecting the old and long-established 'ebb and flow' test of navigability as a source for the navigational servitude." *See Kaiser Aetna,* 444 U.S. at 179–80, 181, 100 S.Ct. 383 (Blackmun, J., dissenting); *see also Dardar v. Lafourche Realty Co.,* 55 F.3d 1082, 1084 (5th Cir.1995) ("The servitude is not visited upon the waterway made navigable by the direct actions of

man which does not displace a naturally navigable waterway.").

■ 105. However, for purposes of establishing the limits of the federal courts' admiralty jurisdiction, and thus the articulation of significance here, "[t]he term 'navigable waters' means ... 'a body of water which, in its present configuration, constitutes a highway of commerce, alone or together with another body of water, between the states or with foreign countries over which commerce in its current mode is capable of being conducted.' "[10] *Rice v. Harken Exploration,* 89 F.Supp.2d 820, 823–24 (N.D.Tex.1999) (citing *Johnson v. Colonial Pipeline Co.,* 830 F.Supp. 309, 312 (E.D.Va.1993)); *see also Roth v. Kiewit Offshore Servs., Ltd.,* No. 07–CV–154, 2008 WL 5110875, at *3 (S.D.Tex. Dec. 4, 2008) ("The test of navigability in law is navigability in fact; that is, whether in its natural and ordinary condition a waterway is used, or is susceptible to being used, as a highway for commerce.").

106. If a waterway is capable of being used for interstate commerce, it is said to be a navigable waterway. *Strother v. Bren Lynn Corp.,* 671 F.Supp. 1118, 1119 (W.D.La.), *aff'd,* 834 F.2d 1023 (5th Cir. 1987).

107. Whether the waterway has been or is presently used for interstate commerce is of no import; its capability for such use is the key to the jurisdictional determination. *See Foremost Ins., Co.,* 641 F.2d at 316 ("If the waterway is capable of being used in commerce, that is a sufficient threshold to invoke admiralty ju-

risdiction"); *Duke v. United States,* 711 F.Supp. 332, 334 (E.D.Tex.1989) ("Even assuming that the traffic on the bayou was not commercial at the relevant time, it is evident that the bayou was physically capable of being used as a highway of commerce.").

108. The parties here concur that the primary issue determinative of the Court's authority to reach the merits of the case is whether the alleged vessel is indeed located within, or within the reaches of, a navigable waterway. However, the parties disagree, of course, on the definition of navigability to be applied.

109. First, Smith identified the Work Area in which he believes the abandoned vessel lies as a rectangular area approximately six-hundred square feet in size, which is positioned in an area between the northern banks of Mission River and the southern shore of Melon Lake.

110. According to Smith's testimony, the Work Area includes portions of Melon Lake.

111. Smith applied to the Corps for a jurisdictional determination and a permit to conduct salvage and excavation operations within the Work Area.

112. The Corps made a determination that it maintained jurisdiction over the Work Area because there are "navigable waters of the U[nited] S[tates] within the [RHA] jurisdiction (as defined by 33 C.F.R. part 329) in the review area" and because there are "waters of the U[nited]

---

**10.** Courts have further defined a two-prong test for admiralty jurisdiction in tort cases, which requires that the tortious activity: (1) occur on navigable waters; and (2) have a substantial relationship to traditional maritime activity. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 533–34, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995); *Richardson v. Foremost Ins., Co.,* 641 F.2d 314, 315 (5th Cir.1981); *Hardwick v.*

*Pro–Line Boats, Inc.,* 895 F.Supp. 145, 146–47 (S.D.Tex.1995). Although this two-prong test is inapplicable here, the parties rely upon several of these maritime tort cases to advance their respective arguments on the jurisdictional issue in this case. The Court finds these cases helpful to the extent they discuss the navigability requirement for general admiralty jurisdiction.

S[tates] within the [CWA] jurisdiction (as defined by 33 C.F.R. part 328) in the review area."

113. Furthermore, the Corps determined that the Work Area is a wetland adjacent to a navigable waterway under the CWA.

114. Smith contends the Corps' finding should control the issue of this Court's jurisdictional determination.

■ 115. Although the Corps's determination is not determinative of the Court's admiralty jurisdiction, it is, from an evidentiary standpoint, significant, and the Court finds it relevant to, but not determinative of, this Court's jurisdictional inquiry. *See Sanders v. Placid,* 861 F.2d 1374, 1378 (5th Cir.1988).

116. It is undisputed that Mission River and Melon Creek are navigable waters of the United States for purposes of this Court's admiralty jurisdiction.

117. Indeed, Melon Creek is connected to the Mission River, which flows into Copano Bay. In turn, Copano Bay opens into Mission Bay, which flows into the Gulf of Mexico. These waters form a continuous highway between states over which interstate travel or commerce can be conducted.

118. It is also agreed that the Tributary connects Melon Creek to Melon Lake.

119. The determinative issue here, then, is whether the Tributary is navigable such that the continuous highway formed by the Mission River and Melon Creek extends to Melon Lake, making Melon Lake a navigable water of the United States.

120. Sorenson argues that the Tributary is not a navigable waterway. Sorenson relies on the testimony of her expert, Captain Wagner, and his conclusion that the Tributary is not navigable.

121. The Court declines to accept Captain Wagner's conclusion.

122. Secondly, Sorenson maintains that the Tributary cannot be found to be a navigable waterway because it is often too low for any vessel to pass from Melon Creek into Melon Lake.

■ 123. However, the fact the Tributary is at times too low to be navigable is not determinative. *See Sanders,* 861 F.2d at 1377 ("To the extent [Defendant] is arguing that seasonal nonnavigability is sufficient to render waters nonnavigable as a matter of law, we reject this argument.").

124. Smith need only prove that at some point in time the Tributary is navigable such that it forms a continuous highway capable of interstate commerce. *See id.; Duke,* 711 F.Supp. at 334.

125. Smith's expert, Commander Cole, opined that the Tributary formed a navigable waterway leading into Melon Lake.

■ 126. Indeed, Commander Cole testified that he was able to navigate into Melon Lake from Melon Creek through the Tributary, albeit by using the "back and fill" method.

127. The Court finds Commander Cole's testimony persuasive.

128. Furthermore, Engelking, a local resident, testified by deposition that he traveled through the Tributary to Melon Lake to go fishing four to five times in the last few years using a twenty-foot Carolina Skiff.

129. On at least one occasion, Engelking traveled from Mission River, to Melon Creek, through the Tributary, into Melon Lake, out another tributary, and back into Melon Creek to fish in lakes north of Melon Lake. Engelking traveled back the same way.

130. Finally, in December 2008, Smith hired an airboat to transport him and Schwartz into Melon Lake through the Tributary.

131. The Court viewed the video Smith made on that voyage. It clearly shows Smith's hired airboat traveling unimpeded up Mission River, into Melon Creek, through the Tributary, and into Melon Lake.

132. The evidence before the Court demonstrates that one can navigate from the Gulf of Mexico, up through Mission River and Melon Creek, and into Melon Lake unimpeded.

133. Consequently, the Court finds, as a matter of law, that Melon Lake, the Tributary connecting Melon Creek to Melon Lake, Melon Creek, Mission River, Copano Bay, Mission Bay and the Gulf of Mexico form a continuous highway between states over which travel or commerce can be conducted. *See Harken Exploration*, 89 F.Supp.2d at 823–24; *Kiewit Offshore Servs.*, 2008 WL 5110875, at *3.

134. Thus, the Court finds it is a navigable waterway. *See Harken Exploration*, 89 F.Supp.2d at 823–24; *Kiewit Offshore Servs.*, 2008 WL 5110875, at *3.

135. Because the Work Area identified by Smith, which encompasses what he claims is the wreckage of the alleged abandoned vessel, includes portions of Melon Lake, the alleged abandoned vessel's location therefore lies within the navigable waters of the United States.

136. Consequently, the Court properly maintains subject matter jurisdiction over this controversy. *See* 28 U.S.C. § 1331(1); *Harken Exploration*, 89 F.Supp.2d at 823–24.

137. The Court must now determine whether Sorenson has standing to contest Smith's claim.

*B. Intervenor's Standing*

138. Secondly, Smith contends Sorenson lacks standing to contest his claim because Sorenson failed to file a verified claim to the vessel pursuant to Supplemental Admiralty Rule C(6)(a).

139. Under Rule C(6)(a) a "person who asserts a right of possession or any ownership interest in the property that is the subject of the action must file a verified statement of right or interest." Fed. Supp. Adm. R. C(6)(a).

140. In support of his contention, Smith relies upon cases in which courts arrested vessels or other tangible properties. *See United States v. One 1988 Dodge Pickup*, 959 F.2d 37, 42 n. 6 (5th Cir.1992); *Marex Int'l, Inc. v. Unidentified, Wrecked & Abandoned Vessel*, 952 F.Supp. 825, 826 (S.D.Ga.1997).

141. Here, however, the parties dispute the very existence of the alleged abandoned vessel.

142. Moreover, no warrant issued for arrest of, or execution on, any vessel or other tangible property subject to execution under the Rules, and there was no execution of process on, or possession of, any vessel or other tangible property by the U.S. Marshal or any other person with a warrant in accordance with the Rules.

143. Smith moved the Court to allow him to publish a notice in the local newspaper requiring claimants of the alleged shipwreck to file a verified claim; however, the Rules only authorize Smith's requested newspaper notice "if the property is not released within 10 days after execution." Fed. Supp. Adm. R. C(4).

144. In this case, no execution on any vessel or other tangible property occurred, and there is no provision for issuing a newspaper notice in lieu of a warrant for arrest of the vessel or property when there has been no execution on any vessel or property and when no vessel or property has been seized or arrested. *See* Fed. Supp. Adm. R. C(4).

145. In this case, the Court finds no basis in the law of admiralty or otherwise for requiring Sorenson to file a verified claim to property the existence of which is disputed, and for which no warrant has issued or executed, and which has not been seized or arrested.

146. Nor is Sorenson required to file a verified claim to the alleged abandoned vessel in order to contest the Court's jurisdiction.

147. The Court, therefore, finds Sorenson has standing to contest Smith's claims and this Court's jurisdiction.

148. Having determined the Court has admiralty jurisdiction and Sorenson has standing to contest Smith's claims, the Court must now determine if Smith is entitled to a declaration of ownership of the alleged abandoned vessel under the law of finds, or alternatively, the right to salvage the alleged abandoned vessel and receive an award under the law of salvage.

### C. Law of Finds

149. Smith contends he is entitled to a declaration of title and ownership of the alleged abandoned vessel under the law of finds.

150. At the outset, the Court notes "[t]he law of finds is disfavored in admiralty." *Columbus–America Discovery Group v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 460 (4th Cir.1992) (quoting *Hener v. United States*, 525 F.Supp. 350, 356 (S.D.N.Y.1981)).

151. Rather, courts favor applying the law of salvage. *Id.* Indeed, there are very few cases applying the law of finds. *See Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 671 (5th Cir.2000) ("[T]here are only a handful of cases applying the law of finds."); *Columbus–Am. Discovery Group*, 974 F.2d at 461–62 & n. 2 (discussing the few cases in which courts have applied the law of finds).

152. Nonetheless, to establish a claim under the law of finds, Smith "must show: (1) intent to reduce property to possession; (2) actual or constructive possession of the property; and (3) that the property is either unowned or abandoned." *Odyssey Marine Exploration, Inc. v. The Unidentified, Shipwrecked Vessel*, No. 8:06–CV–1685–T–23TBM, 2006 WL 3091531, *3 (M.D.Fla. Oct.30, 2006) (citing *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 532 n. 3 (4th Cir.2006)); *see also Unione Mediterranea Di Sicurta*, 220 F.3d at 671 (discussing abandonment requirement under law of finds).

#### (i) Unowned or Abandoned Property

153. The Court first addresses the third element of the law of finds, the requirement that any property claimed under the law of finds must be unowned or abandoned by its original owner. *See Odyssey Marine*, 2006 WL 3091531, at *3; *Unione Mediterranea Di Sicurta*, 220 F.3d at 671; *Columbus–Am. Discovery Group*, 974 F.2d at 460–61.

154. Courts generally are hesitant to find abandonment. *See, e.g., Columbus–Am. Discovery Group*, 974 F.2d at 463.

155. In fact, "[t]he [United States Court of Appeals for the] Fifth Circuit has noted that even when a vessel is abandoned the original owner is not divested of title 'except in extraordinary cases ... where the property has been lost or abandoned for a very long period.'" *Unione Mediterranea Di Sicurta*, 220 F.3d at 671 (citing *Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir.1981)).

156. Nonetheless, "[w]hether a sunken wreck has been abandoned is a question of fact." *Nunley v. M/V Daunt-*

*less Colocotronis,* 863 F.2d 1190, 1198 n. 11 (5th Cir.1989).

157. As other courts have noted, there are two types of cases in which courts apply the law of finds: (1) cases in which "items are recovered from ancient shipwrecks and no owner appears in court to claim them"; and (2) cases in which "owners have expressly and publicly abandoned their property." *Unione Mediterranea Di Sicurta,* 220 F.3d at 671; *Columbus–Am. Discovery Group,* 974 F.2d at 461.

■ 158. Abandonment under the law of finds must be shown by clear and convincing evidence. *Unione Mediterranea Di Sicurta,* 220 F.3d at 671 (quoting *Falgout Brothers, Inc. v. S/V Pangaea,* 966 F.Supp. 1143, 1145 (S.D.Ala.1997)).

159. Here, there is no evidence of any express abandonment of an alleged shipwreck in this lawsuit. Furthermore, Smith produced no items recovered from any alleged shipwreck so as to trigger a former owner's duty to make a claim for them. *See id.*

160. Smith points to *Marex* to support his proposition that Sorenson's failure to assert a verified claim for the alleged vessel constitutes abandonment by the owner. *See Marex Int'l,* 952 F.Supp. at 828. However, Smith's reliance upon *Marex* is misplaced.

161. First, in *Marex,* as in nearly every other admiralty salvage case, the plaintiff-salvor actually recovered items from the wrecked vessel, which would allow identification of the wreck or its cargo, and brought the items into the Court's jurisdiction. *See id.* (stating plaintiff actually recovered and brought to court "pieces of the vessel's engines and boilers, ornate fittings from the passengers' cabins, china and dishware, brass spikes and nails, a collection of 18 U.S. gold Quarter Eagles, half dollar denomination coins minted from the years 1834 until 1840, and two ornate gold pocket watches").

162. Here, however, Smith brought nothing before the Court by which a former owner could identify the alleged ship or its cargo and thus make a claim.

163. Secondly, Sorenson has made no claim of ownership in the alleged abandoned vessel. Indeed, Sorenson argues, quite vociferously, that there *is no* vessel located where Smith claims one to be located. Thus, there is nothing to claim.

164. Finally, if, as Smith seems to contend, the alleged vessel is a Spanish barkentine, title would remain with, presumably, the Kingdom of Spain. The Court notes, however, that Spain has not attempted to enter this contest and has made no claim to Smith's alleged discovery. *See Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 556 F.Supp. 1319, 1334 n. 2 (S.D.Fla.1983); *Cobb Coin Co., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 525 F.Supp. 186, 198 (S.D.Fla. 1981).

165. Yet, courts have found that where, as here, "the property encompass[es] an ancient and longlost shipwreck, a court may infer an abandonment." *Columbus–Am. Discovery Group,* 974 F.2d at 464–65.

■ 166. Consequently, the Court determines that to the extent a vessel exists upon the location Smith claims, it is abandoned by its original owner.

167. Nevertheless, in order to recover on a claim under the law of finds, Smith still must satisfy all three requisite elements. *See Odyssey Marine,* 2006 WL 3091531, at *3.

*(ii) Intent to Reduce Property to Possession*

168. The Court next addresses the first element of the law of finds, the requirement that the finder establish his intent to

reduce the found property to his possession. *See id.*

169. It is clear Smith possesses the requisite intent to possess whatever abandoned property he believes rests below the surface of the area in which he claims he has discovered an abandoned vessel. Smith has made numerous trips to the location, taken metal detector readings, filed the appropriate applications for excavation with the Corps, and has filed this suit in an attempt to secure his rights to the alleged bounty.

170. However, "the law of finds requires a finder to demonstrate not only the intent to acquire the property involved, but also possession of that property, that is, a high degree of control over it." *Hener,* 525 F.Supp. at 356; *see also R.M.S. Titanic,* 435 F.3d at 532 n. 3.

171. "If either intent or possession is found lacking, the would-be finder receives nothing." *Hener,* 525 F.Supp. at 356.

172. Consequently, the Court must determine, in addition to his intent to possess property from the alleged abandoned vessel, whether Smith actually reduced the property to his possession. *See id.*

*(iii) Actual or Constructive Possession*

173. Finally, under the law of finds, "title to abandoned property vests in the person who reduces that property to his or her possession." *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel,* 569 F.2d 330, 337 (5th Cir.1978).

174. "As a general rule, under the law of finds, a finder acquires title to lost or abandoned property by 'occupancy', i.e. by taking possession of the property and exercising dominion and control over it."

*Treasure Salvors,* 640 F.2d at 571, 572–73 ("Persons who actually reduce lost or abandoned objects to possession and persons who are actively and ably engaged in efforts to do so are legally protected against interference from others, whereas persons who simply discover or locate such property, but do not undertake to reduce it to possession, are not."); *cf. Brady v. The African Queen,* 179 F.Supp. 321, 324 (D.Va.1960) (holding that a claimant who boarded a derelict vessel and published a newspaper advertisement claiming salvage rights, but made no attempt to salvage the vessel, was not entitled to possession of the vessel).

175. Here, Smith presents no credible evidence that he has reduced to his possession any abandoned property so as to entitle him to ownership of any alleged shipwreck.

176. Indeed, the only evidence of an abandoned shipwreck Smith offered at trial was his own testimony and a photocopy of a photograph of a small object that Smith claims is a piece of wood from the alleged barentine vessel.[11]

177. The Court finds this evidence to be insufficient to establish that the alleged vessel or any part of it or its armament, apparel, tackle or cargo exists at all or, if it does, that it lies in the location at which Smith claims.

178. Moreover, even assuming Smith has discovered an actual shipwreck, as he alleges, he has presented no evidence that he has reduced the shipwreck to his possession. *Cf. Deep Sea Research,* 523 U.S. at 496, 118 S.Ct. 1464 (noting that petitioner sought salvage award "[b]ased on its

---

11. As previously noted, Smith testified he knows the object to be a piece of the abandoned ship because he tested it by placing it in the microwave for thirty to forty seconds. The object began to smoke, which Smith said is the creosote in which wood used to build ships of this era was soaked. Smith admits that he no longer knows where the actual object is because it became lost when his friend moved his company warehouse.

possession of several artifacts from the [sunken vessel], including china, a full bottle of champagne, and a brass spike from the ship's hull").

179. Simply put, Smith has not proven that he has discovered an abandoned shipwreck and has certainly not reduced anything from his discovery to his possession. *See Treasure Salvors,* 640 F.2d at 571.

180. Accordingly, the Court finds as a matter of law that Smith is not entitled to a declaration of right to title to any alleged abandoned vessel under the law of finds.[12]

### D. Law of Salvage

181. Alternatively, Smith asserts he is entitled to the right to salvage the object of his discovery to the exclusion of all others and to receive an award under the law of salvage.

182. It is well-settled under the law of salvage that in order to earn entitlement of a salvage award, a salvor must prove three elements: (1) a marine peril; (2) voluntary service rendered when not required as an existing duty or from a special contract; and (3) success in whole or in part, or contribution to, the success of the operation. *The SABINE,* 101 U.S. 384, 384, 25 L.Ed. 982 (1879); *United States v. Ex–USS Cabot/Dedalo,* 297 F.3d 378, 381 (5th Cir.2002); *Margate Shipping Co. v. M/V JA Orgeron,* 143 F.3d 976, 984 (5th Cir.1998) ("An award of salvage is generally appropriate when property is successfully and voluntarily rescued from

marine peril."). The Court addresses each element in turn.

### (i) Maritime Peril

183. "[T]he peril required in a salvage service need not necessarily be one of imminent and absolute danger. The property must be in danger, either presently or reasonably to be apprehended." *Treasure Salvors,* 569 F.2d at 337 n. 13 (quoting NORRIS, THE LAW OF SALVAGE § 185 (1958)); *see The Leonie O. Louise,* 4 F.2d 699, 700 (5th Cir.1925) (articulating the standard for marine peril as danger "reasonably to be apprehended").

184. Courts have found maritime peril to exist in cases of ancient, abandoned shipwrecks. *See Cobb Coin Co. v. The Unidentified, Wrecked & Abandoned Sailing Vessel,* 549 F.Supp. 540, 557 (S.D.Fla. 1982) (citing *Platoro Ltd. v. Unidentified Remains of a Vessel,* 614 F.2d 1051, 1055 (5th Cir.1980)).

185. And, where the location of an abandoned shipwreck is unknown, it is said to be at marine peril as a matter of law. *See Platoro Ltd., Inc. v. Unidentified Remains of a Vessel,* 695 F.2d 893, 901 & n. 9 (5th Cir.1983).

186. Moreover, a vessel in peril of being lost through the action of the elements or of pirates, and not being salvaged, is subject to maritime peril. *Cobb Coin,* 549 F.Supp. at 557.

187. Smith testified that, according to his metal detector readings, the vessel has

---

12. The Court notes that under the common law of finds, "when the abandoned property is embedded in the soil, it belongs to the owner of the soil." *United States v. Shivers,* 96 F.3d 120, 124 (5th Cir.1996) (quoting *Klein v. Unidentified Wrecked & Abandoned Sailing Vessel,* 758 F.2d 1511, 1514 (11th Cir.1985)). Moreover, "when the owner of the land where the property is found (whether on or embedded in the soil) has constructive possession of the property such that the property is not 'lost,' it belongs to the owner of the land." *Klein,* 758 F.2d at 1514. Consequently, even assuming, *arguendo,* that Smith has indeed located an abandoned barkentine vessel submerged in the soil at the location at which he claims, to the extent the vessel lies on private property, Smith's claim may be preempted by that of the landowner. *Id.*

listed to the side and its cargo has spread northward under Melon Lake.

188. Moreover, Smith believes expanding clay has contributed to wide distribution of the wreckage in the Work Area and that the alleged vessel is at risk of liquification due to the expanding clay in which the alleged vessel is submerged.

189. Assuming, without deciding, that the alleged vessel exists where Smith claims it exists, the Court determines that it is in marine peril and subject to loss to the elements. *See Platoro Ltd.*, 695 F.2d at 901 & n. 9; *Cobb Coin*, 549 F.Supp. at 557.

### (ii) Voluntary Efforts to Salvage

190. Next, in order to recover under the law of salvage, a salvor also must prove that the efforts undertaken to salvage the property at peril were undertaken voluntarily and not pursuant to some other obligation or duty. *See, e.g., Legnos v. M/V Olga Jacob*, 498 F.2d 666, 672 (5th Cir.1974); *Cobb Coin*, 549 F.Supp. at 557.

191. There appears to be no dispute that any efforts Smith expended in his belief that an abandoned vessel exists were made voluntarily, and he is under no contractual obligation or other duty to make such undertaking.

192. The Court must determine, then, whether Smith's actions have contributed to the successful salvage of the abandoned property for which he seeks a salvage award.

### (iii) Salvage Success

193. It is axiomatic that success is a prerequisite to earning a salvage award. *The Blackwall*, 77 U.S. (10 Wall.) 1, 12, 19 L.Ed. 870 (1869) ("Success is essential to the claim."); *W. Coast Shipping Brokers Corp. v. The Ferry "CHUCHEQUERO,"* 582 F.2d 959, 960 (5th Cir.1978) ("The rule in salvage cases has always been that only success is rewarded.").

194. This rule necessitates some showing that the would-be salvor has saved property from peril. *See The SABINE*, 101 U.S. at 384.

195. In a case such as this involving an alleged sunken treasure ship, this showing no doubt is made by bringing before the Court some portion of the *res* or fruit of the salvage operation.[13] *See e.g., Treasure Salvors*, 569 F.2d at 337; *Yukon Recovery, L.L.C. v. Certain Abandoned Property*, 205 F.3d 1189, 1195 (9th Cir.2000); *Platoro Ltd.*, 695 F.2d at 901; *Cobb Coin*, 549 F.Supp. at 557.

196. Moreover, to maintain an action to exclude all others from salvaging the property, the petitioner must demonstrate the "intention and *capacity* to save the property involved." *Hener*, 525 F.Supp. at 357 (emphasis added).

197. Smith contends that without his efforts, the location of the vessel would still be unknown.[14]

198. Smith asserts that he has researched the history of the vessel, the history of the area, been to the alleged

---

**13.** The Court undertook an extensive review of the cases in which courts applied the law of salvage to lost and abandoned shipwrecks. The Court found no case, and Smith offers none, in which a court granted a salvage award to a potential salvor who offered no proof that property was salvaged and presented no evidence in the way of tangible artifacts taken from the wreck to be salvaged. Indeed, in every case, the petitioning salvor presented artifacts salvaged from the wreckage to which he sought a salvage award.

**14.** The Court is not persuaded by this assertion. Indeed, because Smith presents no credible evidence that a vessel exists where he claims one to exist, it can be said that even despite Smith's efforts, *the location of the barkentine of Barkentine Creek legend is in fact still unknown.*

vessel's location, made appropriate application with the Corps to conduct salvage operations, and has obtained a determination of jurisdiction from the Corps.

199. Smith claims he has consulted with the project manager responsible for salvage operations of the Titanic. Moreover, Smith contends he has a salvage company ready to conduct salvage operations when and if the Corps issues its permit.

200. However, Smith has recovered no artifacts, and presents no evidence, other than his own testimony regarding metal detector readings, that anything of value or historical significance actually exists where he claims it exists. *See The SABINE,* 101 U.S. at 384 ("Proof of success, to some extent, is as essential as proof of service, for if the property is not saved, or if it perishes, or, in case of capture, if it is not retaken, no compensation will be allowed."). Simply put, Smith presents no credible evidence that he has actually saved any property from peril. *See id.*

■ 201. Here, the Court finds that, although Smith took some voluntary efforts to salvage what he thought to be an ancient and abandoned shipwreck subject to marine peril, Smith nonetheless fails to demonstrate that those efforts, in any way, contributed to any successful salvage of lost or abandoned property.[15] *Cf. Legnos,* 498 F.2d at 672 (finding salvors entitled to award when actions "bore directly on the successful efforts" to save vessel).

202. Thus, the Court determines Smith is not entitled to an award under the law of salvage.

### E. Attorneys' Fees

203. Sorensen argues that Smith's prosecution of this case to trial is vexatious and in bad faith and therefore Sorenson is entitled to recover attorneys' fees and costs from Smith.

204. Sorenson asserts that Smith's conduct in filing this lawsuit was frivolous and in bad faith because, Sorenson argues: (1) Smith's only evidence of a vessel being at the location at issue is a fuzzy and indefinite satellite image, which when converted to actual surface measurements is nearly ten times the size of the alleged vessel; (2) Smith failed to use any maps or other navigation aids to actually locate the site; (3) Smith failed to document the site with photographs, videotapes, or even other witness testimony; (4) Smith concocted testimony, such as the inaccuracy of the federally operated GPS so as to cast aspersions on Sorenson's witnesses who went to and documented the actual location using GPS; and (5) Smith continued to pursue his claims to trial without credible evidence.

■ 205. "According to the general 'American Rule' applied in admiralty cases, attorney fees are not awarded absent a statutory or contractual authority." *Unione Mediterranea Di Sicurta,* 364 F.3d at 656–57 (citing *Alyeska Pipeline Serv. Co.*

---

**15.** Sorenson also contests Smith's capacity to mount such an ominous salvage operation and points to Smith's own testimony regarding his inability to procure a profit in various business ventures since 1990. Even assuming, *arguendo,* Smith's sunken treasure ship does exist, the Court questions Smith's capacity to secure the "financial and professional resources required to salvage" it or its alleged hordes of loot, particularly given his lack of experience and training in such recovery and his own admission that he has failed to earn any money from any of his numerous business ventures since 1990. *See Yukon Recovery,* 205 F.3d at 1192–93; *Hener,* 525 F.Supp. at 357. However, the Court need not determine the scope of Smith's capacity because the Court finds Smith has failed to demonstrate that he ever has successfully salvaged anything.

*v. Wilderness Soc'y,* 421 U.S. 240, 268–69, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)).

206. However, it is within the inherent power of the Court to "assess attorneys' fees … when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Alyeska Pipeline,* 421 U.S. at 258–59, 95 S.Ct. 1612; *Vaughan v. Atkinson,* 369 U.S. 527, 530–31, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

207. Despite his failure to provide the Court with credible evidence that an abandoned vessel exists where he claims one exists, the Court finds that Smith genuinely believes in his own mind that he actually has discovered the resting place of an ancient shipwreck.

208. As fanciful as Smith's claims may seem, the Court does not find them vexatious or made in bad faith. *See Alyeska Pipeline,* 421 U.S. at 258–59, 95 S.Ct. 1612.

209. In short, the Court finds that Smith's conduct was not "so abusive of the litigation process that [his] conduct could be described as callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent." *See Galveston County Nav. Dist. No. 1 v. Hopson Towing,* 92 F.3d 353, 359 (5th Cir.1996) (internal citation omitted).

210. Therefore, the Court determines Sorenson is not entitled to recover attorneys' fees from Smith.

### CONCLUSION

Given all the foregoing, the Court hereby

ORDERS that Plaintiff's claims are DISMISSED. The Court further

ORDERS that Intervenor's request for attorneys' fees is DENIED. The parties shall pay their own costs.